**Opinion filed August 6, 2009**



In The

# Eleventh Court of Appeals

_____

## No. 11-08-00284-CV

_____

## BANDERA DRILLING CO., INC. AND RAYBURN L. BRAZZEL, Appellants

## V.

## SLEDGE DRILLING CORP., Appellee

**On Appeal from the 385th District Court**
**Midland County, Texas**
**Trial Court Cause No. CV46357**

### O P I N I O N

This is a dispute over the enforceability of a covenant not to compete. The trial court reformed the covenant by reducing the covered territory, found that the reformed covenant was enforceable, and granted injunctive relief. We reverse and remand.

### I. *Background Facts*

In 2005, David W. Sledge and Spencer Armour were working for a large drilling company but were interested in operating their own company. Sledge ran into Rayburn L. Brazzel at a convenience store. Brazzel owned a drilling company, Bandera Drilling Co., Inc. Their encounter

led to a conversation about Sledge and Armour acquiring Bandera Drilling's rigs. The parties signed a letter of intent on October 21, 2005. They ultimately met on a Saturday morning in February 2006 at Brazzel's office in Abilene and worked out the terms of an agreement themselves.

The parties labeled their agreement "BANDERA DRILLING COMPANY, INC. SIX DRILLING RIGS AND THREE PIECES OF EQUIPMENT PURCHASE AGREEMENT." The agreement defined Bandera Drilling Company, Inc. d/b/a Bandera Supply Company as the seller. Bandera Supply was originally incorporated as a separate entity; however, because of tax law changes, Brazzel began operating it as a dba of Bandera Drilling instead, although he continued to maintain separate books for the two companies.

The agreement conveyed six drilling rigs, a mud pump, a rotary table, and a swivel to Sledge Drilling for $34,000,000: $33,950,000 was payable to Bandera Drilling, and the remaining $50,000 to Brazzel. As part of the agreement, Bandera Drilling and Brazzel agreed not to compete with Sledge Drilling by engaging in the oil or gas well contract drilling business "West of the North/South line drawn through the Colorado City, Texas courthouse" for five years.

Brazzel signed the agreement individually and on behalf of Bandera Drilling. Brazzel and his wife executed written consents to the agreement as both shareholders and directors of Bandera Drilling. Brazzel also signed an assignment and bill of sale on behalf of Bandera Drilling in which he conveyed "all of the rights, title and interest, tangible and intangible" that Bandera Drilling had in the six rigs and three pieces of equipment.

The agreement's structure provided tax benefits for both parties. Sledge Drilling was responsible for any sales taxes. A Sledge Drilling representative met with the Texas Comptroller's office and acquired a Texas Direct Payment Sales Tax Permit based upon the fact that it was acquiring an identifiable segment of Brazzel's business. Because of this, no sales tax was owed on the transaction. Bandera Drilling received potential federal income tax benefits. Brazzel's goal was to do a like-kind exchange to avoid recapturing depreciation by having Bandera Supply sell the old rigs, buy new rigs, and then trade them to Bandera Drilling.

Bandera Drilling's employees were introduced to Sledge and Armour as the new owners. The rig hands went to work for Sledge Drilling, and Bandera Drilling transferred at least a portion of their employment files so that they could obtain health insurance. Bandera Drilling retained

approximately forty employees. Some of these were working for Bandera's trucking company, some for the supply company, and the rest for Bandera Drilling. Bandera Drilling's salesman, David Gober, introduced Sledge and Armour to Bandera Drilling's customers.

Brazzel sold his rigs so that he could purchase updated rigs. He had been working with National Supply to purchase an electric rig. His intent was to drill wells in Palo Pinto County and Stephens County and to work the Barnett Shale near Fort Worth. The price of the electric rig eventually became too expensive, and he decided to build new rigs instead. He completed his first rig and had it in service in Palo Pinto County or Stephens County in July 2006. In late 2006, Basic Energy contacted Armour. Basic wanted to purchase some drilling rigs. This discussion led to an agreement whereby Basic acquired Sledge Drilling on April 2, 2007.

Brazzel contacted Sledge after the Basic acquisition and unsuccessfully attempted to sell him another rig. Brazzel made other efforts to sell the rig, but he had only one offer – for approximately one-half of what he was seeking, and he elected to put it in service instead in the protected area. Brazzel notified Sledge in December 2007 that he had decided to test the noncompete provision by going back to work in West Texas. Brazzel justified this by contending that Sledge and Armour had orally promised to run their company as a small independent and that their sale to Basic violated this promise. Despite his professed concern for small operators, Brazzel then drilled ten wells for XTO Energy – an NYSE-listed company. Brazzel also claimed that Sledge Drilling promised to drill three wells a year for Mr. Voskamp, Armour's neighbor and the operator of some wells in which Brazzel was an investor, but that it did not do so. In 2006, Voskamp approached Armour about drilling a well. Sledge Drilling's rigs were committed to long-term contracts, but they had a window for one rig. That window did not fit Voskamp's schedule.

Sledge Drilling filed suit to enforce the covenant not to compete. The parties filed competing motions for summary judgment. The trial court reformed the covenant by limiting it to Texas and New Mexico and granted partial summary judgment in favor of Sledge Drilling. Subsequently, the parties reached a partial settlement agreement. Without conceding the covenant's enforceability, they agreed that Sledge Drilling was entitled to an injunction through March 10, 2011, if it was enforceable. Both parties nonsuited with prejudice all requests for relief except for Bandera Drilling

and Brazzel's request for a declaratory judgment on the covenant's validity.  The trial court entered a final judgment consistent with this agreement and its prior partial summary judgment.

## II. *Issues*

Bandera Drilling and Brazzel challenge the judgment with two issues.  They argue first that the trial court erred by finding the covenant enforceable and second that the trial court erred by not striking inadmissible affidavit testimony.

## III. *Analysis*

### A.  Standard of Review.

We review a summary judgment de novo.  *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003).  We review the evidence presented in the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not.  *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).  When both sides move for summary judgment and the trial court grants one motion and denies the other, we review the summary judgment evidence presented by both sides and determine all questions presented.  *Comm'rs Court of Titus County v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997).  In this instance, we render the judgment the trial court should have rendered.  *Id.*

When, as here, we are required to interpret a written agreement, our primary concern is to ascertain the true intentions of the parties as expressed in the instrument.  *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980).  We examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.  *Universal C.I.T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 158 (Tex. 1951).  No single provision taken alone will be given controlling effect. All the provisions must be considered with reference to the whole instrument.  *Myers v. Gulf Coast Minerals Mgmt. Corp.*, 361 S.W.2d 193, 196 (Tex. 1962).  The contracts are construed from a utilitarian standpoint, bearing in mind the particular business activity sought to be served.  *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987).

### B. Is the Covenant Not to Compete Enforceable?

Texas common law has traditionally been hostile to restraints of trade such as covenants not to compete, but the Covenant Not to Compete Act provides:

> [A] covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains

limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

TEX. BUS. & COM. CODE ANN. § 15.50(a) (Vernon 2002). Brazzel argues that his covenant does not satisfy this test and is, therefore, unenforceable because the purchase agreement lacks "any interest worthy of protection." Sledge Drilling responds that the covenant is enforceable because the agreement transferred protectable intangible rights – as reflected by the employee and customer introductions and the transfer of employee files.

Both parties have extensively described the negotiations leading up to the contract, including prior versions of the agreement and the oral promises each allegedly made the other. We cannot consider this extrinsic evidence. Neither party contends that the agreement is ambiguous or is not fully integrated, and the contract contains a merger clause.[1] When a contract contains a merger or integration clause, the contract's execution presumes that all prior negotiations and agreements relating to the transaction have been merged into the contract, and it will be enforced as written and cannot be added to, varied, or contradicted by parol evidence. *ISG State Operations, Inc. v. Nat'l Heritage Ins. Co.*, 234 S.W.3d 711, 719 (Tex. App.—Eastland 2007, pet. denied). During oral argument, Brazzel correctly pointed out that courts can properly consider parol evidence of the surrounding circumstances when interpreting a contract. *See Avnsoe v. Square 67 Dev. Corp.*, 521 S.W.2d 874, 876 (Tex. Civ. App.—Eastland 1975, no writ). Courts have, for example, considered the circumstances leading to the execution of an agreement. *See, e.g., Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587 (Tex. 1996) (interpreting contract's pricing provision in light of the parties' knowledge of impending deregulation and their uncertainty about the impact this would have on gas prices). But when the parties utilize a merger provision, the substance of any pre-execution negotiations, including the text of any prior drafts, is not a permissible consideration absent pleading and proof of an ambiguity, fraud, or accident. *ISG State Operations*, 234 S.W.3d at 719-20. Because that situation is not present, we cannot consider the parties' negotiations – including any prior drafts or oral promises.

---

[1] That clause reads:

This Agreement represents the entire agreement of the Parties and supersedes all prior written or oral agreements. The terms are contractual and not mere recitals.

Courts must consider two questions when determining the enforceability of a covenant not to compete: (1) is there an otherwise enforceable agreement and (2) was the covenant not to compete ancillary to or part of that agreement at the time the otherwise enforceable agreement was made. *Light v. Centel Cellular Co. of Tex.*, 883 S.W.2d 642, 644 (Tex. 1994). The first question is easily resolved because the purchase agreement is an otherwise enforceable agreement. The second question, however, is more difficult because of the divergence between the parties' actions and the express terms of their agreement. Specifically, the agreement contains no reference to business goodwill; however, goodwill was unquestionably transferred.

Brazzel characterizes the purchase agreement as "the naked purchase of rigs and equipment." The agreement does convey title to six rigs and three pieces of equipment, but Brazzel's characterization fails to explain the presence of the noncompete provision or the $50,000 payment to Brazzel individually and, more significantly, Bandera Drilling's post-execution actions. Bandera Drilling introduced Sledge and Armour to its employees as the new owners and gave Sledge Drilling at least some information from their personnel files. The parties have offered conflicting descriptions and explanations of what was done and why. Sledge Drilling contends that the employees were an essential component of the transaction because the rigs could not have been manned without them and that Brazzel transferred all of their employee files. Brazzel asserts that he only transferred the information that was necessary for the employees to obtain insurance and that he was trying to help them secure employment with Sledge Drilling because it would take time to get his new rigs working. Because we are reviewing competing summary judgment motions, we must consider the evidence in the light most favorable to Brazzel and Bandera Drilling. *See City of Keller*, 168 S.W.3d at 827. This requires that we assume that their actions were done strictly for the employees' benefit and not as part of the transaction.

The customer introductions cannot be similarly discounted. There is no dispute that Bandera Drilling's salesman, Gober, introduced Sledge and Armour to its customers. Brazzel argues that this is immaterial because Sledge and Armour already knew Bandera Drilling's customers and because this information is publicly available. Brazzel's explanation ignores the practical significance of Gober's introductions. There is a critical distinction between having a list of Bandera Drilling's customers and being personally introduced to them by Gober. Drilling is a personal services business, and relationships and trust are paramount. Gober's introductions were an endorsement of Sledge and Armour. Even if Sledge and Armour had already met or knew Bandera Drilling's

6

customers, that endorsement had value. Furthermore, it cannot be explained away as a mere accommodation. These introductions undercut Bandera Drilling's future competitiveness in West Texas because they encouraged customers to transition to another drilling company.

Brazzel's characterization of the purchase agreement also fails to account for the shareholder and director consents that Brazzel and his wife signed[2] and the Texas Comptroller's determination that no sales tax was due because of the Occasional Sales Rule. Under this rule, the sale of a business or an identifiable segment of a business is exempt from sales tax. 34 TEX. ADMIN. CODE § 3.316(d) (2002) (Tex. Comptroller of Public Accounts, Sale of a business or an identifiable segment of a business). For the rule to apply, the entire operating assets of the business or an identifiable segment of the business must be sold in a single transaction to a single purchaser. *Id.* Brazzel makes much of the fact that the sale was funneled through Bandera Supply. Sledge Drilling responds that this is of no moment because Bandera Supply's assumed name certificate had previously expired. Regardless of why the dba reference was included in the agreement, it is undisputed that Brazzel had operated his drilling business as a separate entity; that, after the agreement was consummated, he had no drilling rigs; and that over half of his employees were now employed by Sledge Drilling. The comptroller's determination that Brazzel sold at least an identifiable segment of his business has ample support. Consequently, the parties' actions evidence more than a mere equipment sale.

The parties' post-execution actions, however, do not end the analysis because the contract's language is ultimately controlling. *See E. Montgomery County Mun. Util. Dist. No. 1 v. Roman Forest Consol. Mun. Util. Dist.*, 620 S.W.2d 110, 112 (Tex. 1981) (conduct of the parties is ordinarily immaterial when determining the meaning of an unambiguous instrument).[3] A restraint is not ancillary to a contract unless it is designed to enforce a contractual obligation of one of the parties. *Light*, 883 S.W.2d at 647 (citing with approval *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485

---

[2]*See* TEX. BUS. ORGS. CODE ANN. § 21.455 (Vernon 2008) (requiring approval by the directors and shareholders of a corporation when it sells all or substantially all of the assets of the corporation).

[3]The agreement disclaims the parties' ability to informally modify their agreement providing:

> This Agreement may not be amended, altered, modified, or changed in any way except in a writing signed by all the Parties specifically referencing this Agreement. Without limitation, course of performance specifically does not modify or waive any provision herein.

U.S. 717, 739-41 & n.3, 744-46 (1988) (Stevens, J., dissenting))[4]; *see also DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 682 (Tex. 1990) (the otherwise enforceable agreement must give rise to the interest worthy of protection by the covenant not to compete). Bandera Drilling transferred goodwill when it introduced Sledge and Armour to its customers – but it was not contractually obligated to do so. Nor was it contractually obligated to take any action to facilitate the transition of any of its employees to Sledge Drilling.

Sledge Drilling concedes that there was no express contractual obligation but contends that these were illusory promises that became binding obligations when performed. The Texas Supreme Court has held that an illusory promise can furnish consideration for a covenant not to compete when the promise is performed. *See Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651 (Tex. 2006). But there are two principle differences between that case and the present situation. First, in *Sheshunoff*, the illusory promise was contained in the written contract. The actions upon which Sledge Drilling relies were not described in the purchase agreement. Second, in *Sheshunoff*, performance of the illusory promise provided mutuality. The employer made an illusory promise to provide training and confidential information. When that promise was kept, enforcement of the covenant followed because the employer had provided consideration for the employee's reciprocal promise. Here, the post-execution actions were taken by Brazzel or Bandera Drilling. Because they are the restrained parties, their actions, by definition, cannot provide mutuality.

Sledge Drilling alternatively argues that the covenant is enforceable because Brazzel and Bandera Drilling's promise of future performance can be inferred. The Texas Supreme Court has held that a covenant not to compete is enforceable if the agreement to furnish consideration for that covenant can be inferred because of the nature of the contract. *See Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, No. 07-0490, 2009 WL 1028051 (Tex. April 17, 2009). In *Fielding*, an accounting and consulting firm hired a CPA to work as a senior manager in its tax department. The employment agreement included a covenant not to compete. Unlike *Sheshunoff* and *Light*, the employer made no express promise to provide the CPA with confidential information, but the court

---

[4]In the employee/employer context, the supreme court has recognized two requirements for making this determination: (1) the consideration given by the employer in the agreement must give rise to the employer's interest in restraining the employee from competing and (2) the covenant must be designed to enforce the employee's consideration or return promise in the agreement. *See Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, No. 07-0490, 2009 WL 1028051, at \*4 (Tex. April 17, 2009). Those requirements cannot be applied verbatim to commercial transactions such as this because the restrained party is providing rather than receiving the protectable interest. But the court's concern that naked restraints of trade be avoided can be addressed.

found that, because he was being hired to perform work that required the receipt of confidential information, this promise could be inferred. *Id*. at *5.

The purchase agreement in this case supports no similar inference. The extrinsic evidence makes clear that Sledge Drilling intended to operate in West Texas and that it effectively acquired a West Texas going concern, but the contract's written terms would have been equally satisfied if Sledge Drilling had taken the rigs and equipment overseas or if Bandera Drilling had refused to make any introductions or provide any personnel information. *Cf. id.* at *6 ("The circumstances surrounding Fielding's employment indicate that his employment necessarily involved the provision of confidential information by Mann Frankfort before Fielding could perform the work he was hired to do.").

If Bandera Drilling and Brazzel were required to do nothing beyond the express terms of the contract, the covenant is a naked restraint of trade and is, therefore, unenforceable. *See Light*, 883 S.W.2d at 647 (covenants cannot be a stand-alone promise lacking any new consideration). It can be argued that equity requires implying the terms necessary to make the covenant enforceable because Brazzel is otherwise allowed to violate an agreement that he helped draft (and he retains all of the money he received for signing it) simply because an "i" was not dotted or a "t" was not crossed. This is no less true considering that Brazzel's justification for violating the covenant flies in the face of the facts and that it is apparent he chose to do so because he had an excess rig and thought he could without liability. Terms are not to be implied in a contract because they are reasonable but because they are necessarily involved in the contractual relationship and are such that the parties must have intended them and failed to express them only because of sheer inadvertence or because they are too obvious to need expression. *See Fielding*, 2009 WL 1028051, at *5. The conveyance of Bandera Drilling's business goodwill cannot be inferred because it does not meet this test.

Finally, Sledge Drilling contends that the assignment's reference to intangible rights makes the covenant enforceable. The assignment and bill of sale conveyed "all of [Bandera Drilling's] rights, title and interest, tangible and intangible" in the six rigs and associated equipment. Sledge Drilling argues that the only reasonable interpretation of this document is that Bandera Drilling transferred current and prospective relationships with rig employees and customers and intellectual property in the form of employee personnel files. Sledge Drilling does not contend that the employees themselves were assigned but notes that, at the time of the sale, there was a small pool

9

of qualified employees and contends that it had a legitimate business interest in retaining Bandera Drilling's former employees to staff its rigs. Bandera Drilling's introductions, the transfer of at least a portion of the rig hands' personnel files, and Bandera Drilling's promise not to compete in West Texas facilitated that business interest.

The intangible rights Sledge Drilling describes could support a covenant because they could be part of a business's goodwill, but they were not conveyed by the assignment because they are not intrinsic to the rigs or equipment. They are, instead, associated with an ongoing concern. What intangible rights the assignment conveyed is not clear, but Sledge Drilling does not contend that there was anything unique about the physical assets it purchased that would provide a competitive advantage. Consequently, the assignment cannot provide the mutuality required to make the covenant enforceable.

The trial court erred when it found that the reformed covenant not to compete was enforceable. The trial court's judgment is reversed, and the cause is remanded for further proceedings not inconsistent with this holding or the parties' settlement agreement. This holding makes it unnecessary to consider Brazzel and Bandera Drilling's second issue.

## IV. *Holding*

The judgment of the trial court is reversed, and the cause is remanded.


RICK STRANGE

JUSTICE


August 6, 2009

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.

10