**Affirmed in part, Reversed in part, and Remanded, and Opinion and Dissenting Opinion filed June 28, 2013.**



In the

# Fourteenth Court of Appeals

### NO. 14-11-00058-CV
### NO. 14-11-00229-CV

### GORDON WESTERGREN, Appellant/Cross-Appellee

### V.

### NATIONAL PROPERTY HOLDINGS, L.P., MICHAEL PLANK, AND RUSSELL PLANK, Appellees/Cross-Appellants

**On Appeal from the 269th District Court
Harris County, Texas
Trial Court Cause No. 2008-36847**

## O P I N I O N

Gordon Westergren sued two individuals and a limited partnership, alleging breach of contract with regard to an oral agreement, breach of partnership duties, statutory fraud, and common-law fraud. Defendants National Property Holdings, L.P., Michael Plank, and Russell Plank (collectively, the "Plank Parties") counterclaimed, alleging breach of contract with regard to a settlement agreement

and a release. The jury rendered findings favorable to Westergren and adverse to the Plank Parties. The trial court rendered judgment that the parties take nothing on their respective claims. On appeal, Westergren asserts that the trial court erred in rendering judgment he take nothing, in denying him leave to amend his petition during trial, and in awarding court costs to the Plank Parties. On cross-appeal, the Plank Parties argue that the trial court erred in rendering judgment they take nothing. We affirm in part, reverse in part, and remand for limited proceedings.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Appellant Gordon Westergren, a lifelong resident of LaPorte, Texas, wanted to purchase and develop certain real property in LaPorte, specifically, 190 acres on the east side of Powell Road. These 190 acres are situated along a rail line between two shipping terminals. Westergren entered into a purchase option contract with the owners of the 190 acres. The owners later entered into two additional purchase option contracts on the same 190 acres. In July 2004, Westergren filed suit ("the 190-acres litigation") against the owners and the two other parties who claimed an option to purchase the 190 acres, asserting that he possessed the superior right to purchase. Westergren also filed a lis pendens on the property, which effectively prevented the sale and development of the 190 acres.

While the 190-acres litigation was pending, Westergren met the Planks. Specifically, Walter Johnson, then CEO of Amegy Bank, had participated in several "handshake" transactions with Westergren in which Johnson served as the financial partner while Westergren "found and sourced" property deals in the LaPorte area. Although Johnson was not interested in purchasing and developing the 190 acres, Johnson introduced Westergren to two brothers, Michael Plank and Russell Plank, who were clients of the bank. Michael Plank is the President of the corporate general partner of National Property Holdings, L.P. ("NPH"), a Texas

2

limited partnership involved in real estate development. Russell Plank performs consulting services for various companies, including NPH. Several developers, including NPH, were interested in purchasing and developing the 190 acres.

In January 2005, after Westergren met the Planks, Russell Plank contacted Robert Langston, the attorney representing Westergren in the 190-acres litigation. Russell Plank called Langston about paying Westergren's attorney's fees. Langston asked Russell Plank why he would do that for Westergren; Russell Plank responded "[b]ecause we're going to be partners." Langston then received a $5000 check from NPH[1] and a $5000 check "personally" from Russell Plank.[2]

Although the Plank Parties were not parties to the 190-acres litigation, Russell Plank, sent by Michael Plank on behalf of NPH, attended a mediation involving the litigation parties in August 2005. Westergren and Langston attended the mediation. At this mediation, NPH agreed to pay out cash settlements to all the litigants, except Westergren, for their claims on the 190 acres. At the mediation, according to Westergren and Langston, Russell Plank promised that, in exchange for Westergren's release of his lis pendens and the settlement of the 190-acres litigation, Westergren would become a partner of the Plank Parties and would receive $1 million cash and an interest in profits (the exact percentage to be negotiated) from the purchase and development of the 190 acres. Westergren testified that at the mediation Russell Plank said, "Don't worry about it, Gordon. Let's get these guys out of the way, and we'll get it handled."

Langston repeatedly requested of both Russell Plank and Westergren that the parties reduce their partnership deal to writing. In October 2005, Russell Plank

---

[1] This check was co-signed by Russell Plank, and the check's reference was to "LaPorte Property."

[2] This check's memo was for "Legal Fees—GW."

3

presented Westergren with a profits interest agreement drafted by appellees' attorneys. This draft agreement stated that Westergren was to provide consulting services in exchange for a 5% profit interest in funds distributed by NPH. Russell Plank then crossed out the 5% term and hand-wrote 10%, then 20%. This agreement was not signed.

In January 2006, NPH and the parties to the 190-acres litigation entered into a Mediation Settlement Agreement ("MSA"). NPH was a signatory party to the MSA. Neither Michael Plank nor Russell Plank individually was a signatory to the MSA. In the MSA, NPH agreed to purchase the 190 acres in dispute; Westergren and the other parties to the litigation agreed to release any lis pendens, and to release and dismiss all claims regarding the 190 acres.

According to Westergren, at the time that he agreed to sign the MSA, he did so in reliance upon the oral partnership deal with NPH, Michael Plank, and Russell Plank:

> [The Plank Parties] were going to pay me a cool million bucks for signing off, letting them have control of the property, and give me a 5 percent interest in the 190 acres. That's what caused me to give them control of the property.

Westergren further testified that the "final" deal at the time he agreed to "sign away" his lis pendens was "a million in cash and a 5 percent[]—a 5 percent profits participation."[3] According to Westergren, under this 5% profits participation, the Plank Parties would pay Westergren 5% of the profits, if any, that they realized upon selling or "flipping" the 190 acres to a third party.

---

[3] According to Westergren, at some point after Russell Plank presented Westergren with the profits interest agreement where Russell Plank hand-wrote in the 20% profit interest term, Russell Plank presented to Westergren another draft agreement that included the terms of the "cool million bucks and a 5 percent participation."

4

After the mediation, because 190 acres was more land than the Plank Parties were comfortable purchasing and developing, the Plank Parties held meetings with various companies to serve as potential partners, including ML Realty Partners, a Chicago-based investment and development company interested in long-term real estate holdings. In January 2006, NPH entered into a contribution agreement with ML Realty Partners. Under this agreement, upon NPH's acquisition of the entire 190 acres, ML Realty Partners would distribute $6 million to NPH.

On February 14, 2006, Westergren released his lis pendens and dismissed his claim in the 190-acres litigation with prejudice. Two days later, NPH purchased 20 of the 190 acres, and Port Crossing Land, L.P., a limited partnership in which the limited partners were an NPH-affiliated entity[4] and ML Realty Partners, purchased the remaining 170 acres. The purchase price of the 190 acres was approximately $.75 per square foot. ML Realty Partners distributed $6 million to NPH. In June 2006, NPH sold the 20-acre parcel to Del Piso Investments, an Arizona limited partnership, for $1.742 million, or a purchase price of approximately $2 per square foot.[5]

At this time, Westergren still had not received any payment from the Plank Parties, and started calling them. According to Westergren, Russell Plank finally told him, "Look, we can't give you the whole million right now but we're going to give you a half a million bucks." Both Michael Plank and Russell Plank testified that they agreed to pay Westergren $500,000. Westergren met with Russell Plank at the NPH office on June 30, 2006, at which time Russell Plank gave Westergren a check for $500,000.[6] Without reading it, Westergren also signed a two-page

---

[4] This entity was NPH LaPorte Realty, L.P.

[5] In December 2005, Arizona Tile, L.L.C. had entered into an earnest money contract for the purchase of this 20 acres from NPH.

[6] This $500,000 NPH check was co-signed by Russell Plank. In NPH's accounting

5

document entitled "Agreement and Release" ("Release"), which was notarized in Westergren's presence. The Release was drafted by the Plank Parties' attorneys, and the Plank Parties did not send the Release to or discuss it with Langston. The Release stated that in exchange for "receipt" of the $500,000, Westergren released and relinquished any rights and interests in the 190 acres, and released all claims regarding the 190 acres against Michael Plank, NPH, and their agents. Westergren testified that he did not read the document because he did not have his reading glasses[7] with him and was "in a hurry." Westergren admitted he was wearing a watch with a built-in magnifying glass that he sometimes used to help him read. According to Westergren, after he asked what the document was, Russell Plank described it as "just a receipt" and "nothing," and told Westergren "you don't have to worry about it." Russell Plank did not tell Westergren that the document was a release. Westergren testified he relied on Russell Plank's "representation" that the document was "just a receipt" in signing the Release.

In February 2007, Westergren sent a letter to Michael Plank to request the other $500,000 and his "5% interest." Westergren and Michael Plank then met for lunch. Westergren testified that, during lunch, he found out about the Release and Michael Plank told Westergren "you need to read what you sign." The Plank Parties refused to pay Westergren any additional compensation. Westergren filed suit against the Plank Parties, asserting various claims, including breach of contract, breach of partnership duties, common-law fraud, and statutory fraud. The Plank Parties filed a counterclaim asserting that Westergren breached the MSA and the Release by filing suit.

---

records, this payment was approved by "R.D.P." and initially described as for "Land-Fixed Asset." Several months later, the description was changed to "Consulting Fees."

[7] Westergren had undergone ocular lens replacement due to leukemia and could not read documents without eyeglasses.

6

After a trial, the jury found the following:

- Russell Plank agreed to pay Westergren $1 million and a 5% profit interest in the development of the 190 acres in exchange for Westergren's releasing his lis pendens and giving up his contractual right to the 190 acres.[8]

- Russell Plank failed to comply with this agreement.

- NPH, Michael Plank, and Russell Plank each partially performed the agreement to pay Westergren $1 million and a 5% profit interest in the development of the 190 acres.

- Russell Plank's failure to comply with his agreement was not excused.[9]

- The sum of $500,000, if paid now in cash, fairly and reasonably would compensate Westergren for his damages that resulted from Russell Plank's failure to comply with his agreement, based upon the difference between the amount Westergren received from the Plank Parties and the amount Westergren would have received if the Plank Parties had paid him the agreed-upon amount.

- Each of the Plank Parties formed a partnership with Westergren.

- Each of the Plank Parties failed to comply with its respective duty of loyalty to Westergren and with its respective duty of care to Westergren.[10]

- These failures were not excused by Westergren's later taking an inconsistent position to the disadvantage of the Plank Parties.

- The sum of $177,608, if paid now in cash, fairly and reasonably

---

[8] The trial court granted partial directed verdict in favor of the Plank Parties, ruling that any allegation of fraud against NPH prior to the execution of the MSA was barred by the MSA's disclaimer of reliance. Westergren does not appeal this ruling. As a result of this ruling, the parties agreed that NPH would not be submitted as part of the breach-of-contract claim. The jury did not find that Michael Plank individually entered into the oral agreement, and Westergren does not appeal this finding.

[9] The jury was instructed on the Plank Parties' affirmative defenses of prior material breach, waiver, and quasi-estoppel.

[10] The jury found that NPH was 50% responsible, Michael Plank was 25% responsible, and Russell Plank was 25% responsible for causing Westergren harm due to breach of partnership duties.

would compensate Westergren for his damages that were proximately caused by those breaches of partnership duties, based upon the difference between the amount Westergren received from the Plank Parties and the amount Westergren would have received if the Plank Parties had paid him the agreed-upon amount.

- NPH's profit in the acquisition of the 190 acres was $3,552,174.

- Each of the Plank Parties committed common-law fraud by misrepresentation, common-law fraud by omission, and statutory fraud against Westergren.[11]

- The fraud by misrepresentation and statutory fraud were not excused by Westergren's later taking an inconsistent position to the disadvantage of the Plank Parties.

- Zero dollars, if paid now in cash, fairly and reasonably would compensate Westergren for his damages, if any, that resulted from such fraud, based upon the difference between the amount Westergren received from the Plank Parties and the amount Westergren would have received if the Plank Parties had paid him the agreed-upon amount.

- The amount of $200,000 would be a reasonable fee for the necessary services of Westergren's attorney for preparation and trial; $25,000, for an appeal to the court of appeals; and $20,000, for a petition for review to the Texas Supreme Court.

- Westergren did not fail to comply with the MSA or the Release.

The Plank Parties filed a motion to disregard all the jury findings adverse to them and requested a take-nothing judgment as to all of Westergren's claims and judgment in favor of the Plank Parties on their counterclaims.[12] Westergren filed a motion for judgment on the jury's verdict and a motion for disgorgement of profits. The trial court denied the Plank Parties' their motion as to their counterclaims but

---

[11] The jury found that NPH was 30% responsible, Michael Plank was 20% responsible, and Russell Plank was 50% responsible for causing Westergren harm due to common-law fraud by misrepresentation and statutory fraud.

[12] This filing was styled as a motion to disregard the jury's findings and for judgment notwithstanding the verdict.

8

granted it as to Westergren's claims against the Plank Parties. The trial court denied Westergren's motion for disgorgement of profits, granted Westergren's motion for judgment as to the Plank Parties' counterclaims, and denied Westergren's motion for judgment as to Westergren's claims against the Plank Parties. The trial court rendered judgment that Westergren take nothing on his claims and that the Plank Parties take nothing on their claims, and charged Westergren with paying the Plank Parties' costs of court.

## II.   ISSUES PRESENTED

On appeal, Westergren presents five issues. First, Westergren argues that the trial court erred in granting judgment notwithstanding the verdict (JNOV) on his breach-of-contract claim. Second, Westergren contends that the trial court erred in granting JNOV on his partnership claims. Third, Westergren argues that the trial court similarly erred with regard to his fraud claims. Fourth, Westergren complains about the trial court's denial of his request to amend his petition to add a new defense. Finally, Westergren argues that the trial court erred in awarding court costs to the Plank Parties.

On cross-appeal, the Plank Parties present two issues. First, the Plank Parties argue that they conclusively proved (a) that Westergren breached the MSA and the Release by filing the underlying suit and (b) the amount of their resulting damages, such that the trial court should have rendered judgment in their favor on their counterclaims. Second, the Plank Parties contend the jury's finding that Westergren did not breach the MSA and the Release was against the great weight and preponderance of the evidence such that the trial court should have granted the Plank Parties a new trial on their counterclaims. In a conditional cross-issue, the Plank Parties also assert that any recovery by Westergren must be capped at $200,000.

9

### III.     STANDARDS OF REVIEW

Judgment against a jury verdict is proper only when the law does not permit reasonable jurors to decide otherwise. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). We therefore review JNOVs for legal sufficiency of the evidence supporting the verdict, bearing in mind that it is the jury's sole province to evaluate witness credibility and determine the weight to attach to testimony. *Envtl. Procedures, Inc. v. Guidry*, 282 S.W.3d 602, 626 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (citing *City of Keller*, 168 S.W.3d at 819). We consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support the challenged finding, crediting favorable evidence if a reasonable fact finder could and disregarding contrary evidence unless a reasonable fact finder could not. *See City of Keller*, 168 S.W.3d at 823, 827. We cannot substitute our judgment for that of the trier of fact if the evidence falls within this zone of reasonable disagreement. *Id.* at 822. If the evidence viewed in this light would enable reasonable and fair-minded people to find the challenged fact, then JNOV is improper. *See id.* at 823, 827. "We will uphold the jury's finding if more than a scintilla of competent evidence supports it." *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009).

In reviewing factual sufficiency, we must consider and weigh all the evidence. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761–62 (Tex. 2003). We can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Id.* at 761. The jury as trier of fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *GTE Mobilnet of S. Tex.Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 615–16 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). Thus, we may not substitute our

own judgment for that of the fact finder, even if we would reach a different answer on the evidence. *Id.* at 616. The amount of evidence necessary to affirm the fact finder's judgment is far less than that necessary to reverse its judgment. *See id.*

## IV. ANALYSIS

### A. Whether the trial court erred in disregarding the jury's breach-of-contract findings

In his first issue, Westergren argues that the trial court erred in rendering JNOV as to Westergren's breach-of-contract claim. In their motion, the Plank Parties asked the trial court to disregard the jury's findings regarding the breach-of-contract claim based upon the following grounds: (1) Russell Plank cannot be held liable for breach of contract as a matter of law because the evidence conclusively proves he was acting as an agent of NPH and did not assume any personal liability; (2) any breach-of-contract claim was released under the MSA and the Release; (3) the alleged contract is unenforceable for lack of consideration; (4) any agreement reached before the MSA merged into and was superseded by the MSA; (5) the alleged contract is unenforceable because it is subject to the statute of frauds and the evidence is legally insufficient to support the jury's finding of the partial-performance exception to the statute of frauds; (6) because there is no legally sufficient evidence to support the jury's partial-performance finding and because the jury's damages findings are based upon a benefit-of-the-bargain measure of damages, all of the damages findings fail under the statute of frauds; (7) the evidence conclusively establishes the affirmative defenses of waiver, prior material breach, and quasi-estoppel; and (8) the evidence is legally insufficient to support the jury's findings that Russell Plank entered into the alleged oral agreement with Westergren, that Russell Plank failed to comply with this agreement, and as to Westergren's damages resulting from that failure to comply.

The trial court granted the Plank Parties' motion to disregard the jury findings regarding the breach-of-contract claim without specifying the grounds upon which it relied. Therefore, on appeal, Westergren must show that each independent ground fairly asserted against the breach-of-contract claim does not provide a basis for affirming the trial court's judgment as to this claim. *See Fort Bend Cty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991).

### 1. Westergren addressed all the JNOV breach-of-contract bases fairly presented by the Plank Parties.

As an initial matter, the Plank Parties assert that we can affirm JNOV on Westergren's breach-of-contract claim due to Westergren's alleged failure to address one of the Plank Parties' alleged JNOV grounds. We disagree. In their JNOV motion, instead of arguing that partial performance is an equitable doctrine under which a party only may recover reliance damages for breach of contract, as they do in their appellate brief, the Plank Parties merely coupled the lack of legally sufficient evidence of partial performance with the lack of a damages question based on reliance damages to argue that all of Westergren's damages findings fail (ground 6 above). The Plank Parties did not directly attack the jury's finding on breach-of-contract damages. In addition, in their JNOV motion, the Plank Parties only cited cases dealing with non-contract causes of action.[13]

While the Plank Parties cited *Exxon Corp. v. Breezevale Ltd.* in the brief in support of their motion for JNOV, they cited it for the propositions that the partial-performance exception to the statute of frauds was inapplicable and that, because the statute of frauds rendered the alleged oral partnership agreement unenforceable, the Plank Parties could not be liable for any damages resulting from breach of

---

[13] *See, e.g., Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007); *Haase v. Glazner*, 62 S.W.3d 795, 799 (Tex. 2001).

partnership duties.  *See* 82 S.W.3d 429, 439–40, 443 (Tex. App.—Dallas 2002, pet. denied).  The Plank Parties first cited *Exxon* for the proposition that even when the partial-performance exception applies, benefit-of-the-bargain damages are not recoverable at all in a letter written to the trial court, filed the day after the trial court entered its final judgment.  *See id.* at 441.  Although the Plank Parties may have presented this argument orally at the JNOV hearing, the transcript, if any, from the hearing is not in the record.  In any event, we should consider only grounds stated in writing to support the motion.  *See* TEX. R. CIV. P. 301 ("[U]pon motion and reasonable notice the court may render judgment non obstante veredicto if a directed verdict would have been proper . . . ."); *Olin Corp. v. Cargo Carriers, Inc.*, 673 S.W.2d 211, 213–14 (Tex. App.—Houston [14th Dist.] 1984, no writ) (concluding that trial court had no power to enter JNOV absent a proper motion to do so).  Thus, we conclude that Westergren addressed all the JNOV grounds fairly presented to the trial court on his breach-of-contract claim, and we proceed to the appeal's merits.  *See Garza v. Cantu*, —S.W.3d—, No. 14-11-00724-CV, 2013 WL 1460521, at *3 (Tex. App.—Houston [14th Dist.] June 13, 2013, no pet. h.) (op. on reh'g) (overruling appellee's contention that JNOV be confirmed due to appellant's alleged failure to attack one JNOV basis).

## 2. The evidence is legally sufficient to support Russell Plank's individual liability on the contract.

The Plank Parties did not plead agency[14] as an affirmative defense to Westergren's breach-of-contract claim.  However, in their JNOV motion, the Plank Parties argued Westergren failed to establish that his breach-of-contract claim arose against Russell Plank in his individual capacity because the evidence

---

[14] To avoid individual liability under the agency defense, a party must prove that he disclosed his agency capacity to the other contracting party and that he identified the true principal for which he was acting.  *Gordon v. Leasman*, 365 S.W.3d 109, 114–15 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

13

conclusively establishes Russell Plank acted solely as an agent for NPH.[15] Thus, to merit the trial court's JNOV, the Plank Parties were required to show the evidence conclusively proves that Russell Plank did not enter into the oral agreement with Westergren in Russell Plank's individual capacity and that no reasonable jury was free to think otherwise. *See Tanner*, 289 S.W.3d at 830.

Westergren argues that even if Russell Plank did act at times as an agent for NPH, this does not mean Russell Plank was acting solely as an agent and never at all in his individual capacity when he made promises to Westergren. Westergren contends that the trial record shows Russell Plank wore "multiple hats," including one as Russell Plank, individual. We agree. Russell Plank admitted that at times he dealt with Westergren as an independent consultant:

> Q. When you dealt with Mr. Westergren, were you dealing with him as an independent consultant, or were you dealing with him as a representative of National Property Holdings, or were you dealing with him as a representative of the Plank Companies, Inc.?
>
> A. All of the above. I'm a consultant that works for all of those entities.

Russell Plank testified that he was strictly an independent consultant for, and was not a partner and did not have any ownership interests in, Michael Plank's companies. Russell Plank denied that he had any authority to act on behalf of NPH—"Mike makes all decisions" with regard to NPH. Russell Plank only was authorized to act on behalf of NPH by Michael Plank on "some specific issues." Michael Plank confirmed that Russell Plank was a consultant for NPH and

---

[15] In support, the Plank Parties relied on *Walker Insurance Services v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 554 (Tex. App.—Houston [14th Dist.] 2003, no pet.). But *Walker* has limited, if any, applicability because the issue was the sufficiency of the evidence to support the trial court's implied finding regarding agency on a special appearance. This court specifically indicated "when determining whether an agency relationship existed . . . , we must be mindful that the issue of ultimate liability is separate from the issue of jurisdiction." *Id.* at 549.

Westergren was told that. Westergren testified that he dealt extensively with and had been in constant contact by cell phone with Russell Plank; Russell Plank agreed that he spoke to Westergren "much more" than Michael Plank did. Westergren and Langston both testified that their discussions regarding the $1 million and profits-interest "deal" were with Russell Plank. Russell Plank called Langston regarding paying Westergren's attorney's fees in the 190-acres litigation because they were going to be "partners." And Russell Plank admitted that he "personally" wrote a $5000 check to Langston. Westergren further testified it was Russell Plank who called to tell him that it was time to release the lis pendens.

Although Russell Plank at times may have acted as NPH's agent, an agent is not precluded from binding himself on a contract where he has pledged his own personal responsibility in addition to that of his principal. *See Nagle v. Duncan*, 570 S.W.2d 116, 117 (Tex. Civ. App.—Houston [1st Dist.] 1978, writ dism'd). And while the Plank Parties emphasize the fact that the $500,000 check paid to Westergren in June 2006 was issued by NPH, circumstances post contract formation do not relieve an agent from a finding of personal contract liability. *See Gordon v. Leasman*, 365 S.W.3d 109, 115 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (concluding such in case involving oral agreement for carpentry services where invoices were addressed to and checks issued by principal).

Based on all the circumstances surrounding the formation of the contract, there is more than a scintilla of probative evidence that Russell Plank acted in his individual capacity with regard to the oral agreement with Westergren. *See Tanner*, 289 S.W.3d at 830. Viewing the evidence in the light most favorable to the jury's finding, Westergren clearly established a fact issue as to whether Russell Plank was bound on the oral agreement with Westergren in Russell Plank's individual capacity. Because reasonable and fair-minded people could find the

15

challenged fact, if the trial court granted JNOV based on this ground, it was improper. *See City of Keller*, 168 S.W.3d at 823, 827. Thus, this ground does not provide a basis for affirming the trial court's judgment on breach of contract. *See Sbrusch*, 818 S.W.2d at 394.

### 3. The evidence is legally sufficient to support that Westergren did not release his breach-of-contract claim under the MSA and the Release.

In their motion for JNOV, the Plank Parties argued that any breach-of-contract claim was released under both the terms of the MSA and the Release. The jury found that Russell Plank's failure to comply with his oral agreement with Westergren was not excused by any waiver by Westergren. In addition, the jury found that each of the Plank Parties committed fraud by omission. Finally, the jury found no breach of contract by Westergren with regard to either the MSA or the Release.

#### a. The January 2006 MSA

First, we will consider whether the MSA applies to bar Westergren's breach-of-contract claim. The Plank Parties argued that the evidence conclusively showed that Westergren's contract claim fell within the MSA's broad language and thus was barred as a matter of law. The Plank Parties further asserted that Russell Plank was covered by the MSA because at all times he acted as an agent on behalf of NPH.

On appeal, Westergren contends that the MSA did not release any claims against Russell Plank because the MSA fails to refer to Russell Plank with any "descriptive particularity or otherwise," and thus the Plank Parties' argument could not have formed the basis for the trial court's JNOV.

The MSA included the following language:

16

> [A]ll parties to this Agreement agree to release, discharge any and all claims, demands or suits, known or unknown, fixed or contingent, liquidated or unliquidated, whether or not asserted in the above case, as of this date, arising from, or related to, the events and transactions which are the subject matter of this case.

While "all parties" to the MSA agreed to release and discharge "any and all claims" related to the "subject matter" of the 190-acres litigation, and NPH was a signatory party to the MSA, there is no dispute that Russell Plank individually did not sign and was not a party to the MSA. Nor does the MSA specifically refer in any way to the parties' agents; certainly, nothing expressly indicates that the parties to the MSA intended to release Russell Plank from any and all claims.

Moreover, even assuming solely for purposes of our analysis that the MSA would cover claims against agents of signatory parties, we already have concluded more than a scintilla of evidence would support a reasonable jury's finding that Russell Plank acted in his individual capacity, not solely as an agent for NPH, to be bound personally on the oral agreement with Westergren. *See supra* Section IV.A.2. Thus, the Plank Parties' reliance on cases in which releases were found to reach a company's employees or agents who were clearly acting in the scope of their employment or agency is misplaced.[16] We therefore conclude that, viewing it in the light most favorable to the verdict, the evidence raised a fact issue as to whether the MSA even was valid as to Russell Plank. A reasonable and fair-minded jury was permitted to conclude that Westergren did not release his contract

---

[16] *Vera v. N. Star Dodge Sales, Inc.*, 989 S.W.2d 13, 18 (Tex. App.—San Antonio 1998, no pet.) (concluding release reached car dealership employees where plaintiffs did not allege any individual cause of action against employees and there was no question that employees were associated with dealership's sale of car at issue); *Winkler v. Kirkwood Atrium Office Park*, 816 S.W.2d 111, 113–14 (Tex. App.—Houston [14th Dist.] 1991, writ denied) (concluding individuals associated with and "involved in the operation, maintenance, and administration of [fitness] center" were included in release that released "the Club" from liability for injuries suffered during participation in fitness programs).

17

claim against Russell Plank in the MSA.  *See City of Keller*, 168 S.W.3d at 823, 827.  Thus, this subground does not provide a basis for affirming the trial court's judgment on breach of contract.  *See Sbrusch*, 818 S.W.2d at 394.

### b.  The June 2006 Release

The Plank Parties also argued that Westergren released his breach-of-contract claim under the Release.  The Plank Parties complained that Westergren failed to present any evidence of fraud by omission, and therefore, Westergren's fraudulent-inducement defense to the Release fails as a matter of law.  Specifically, the Plank Parties argued that Westergren failed to obtain a relevant jury finding because the only basis presented for his fraudulent-inducement defense was not fraud by omission, but rather fraud by misrepresentation.  Further, even if Westergren had obtained a relevant jury finding as to fraud by misrepresentation, the Plank Parties argued that Westergren justifiably could not rely on the Plank Parties' alleged misrepresentation that the release was a "receipt."  Finally, the Plank Parties asserted that the plain language of the Release bars Westergren's contract claim because it covers agents of Michael Plank and NPH, and at all times Russell Plank was acting in such an agency capacity.

On appeal, Westergren argues the evidence shows that Westergren's signature on the Release was procured by fraud and the jury's findings are consistent with and support Westergren's fraudulent-inducement defense.  Specifically, the evidence shows Russell Plank did not disclose that the document was actually a release; Russell Plank knew that Westergren was ignorant of that fact and did not have an equal opportunity to discover it because he did not have his glasses; Russell Plank induced him into signing the Release by failing to reveal its true nature; and Westergren suffered injury as a result when the Release was later used as the reason to avoid additional payment.  Westergren further argues

18

that the Release does not cover Russell Plank; he is not specifically mentioned in the Release and, at trial, Russell Plank testified that he was "not a party individually" to the Release.

Here, the trial court submitted various fraud questions[17] to the jury with the following understanding: "that plaintiff is seeking damages for material misrepresentation and is alleging fraud by omission as the theory for its fraudulent[-]inducement defense to the enforcement of the June 2006 release."[18] Westergren offered no objection to this characterization of his case to be presented in the charge. Thus, question 14 on fraud by omission was submitted as the question pertinent to whether the Release was "subject to avoidance" on the ground of fraudulent inducement. *See Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990) ("Under Texas law, a release is a contract and is subject to avoidance, on grounds such as fraud or mistake, just like any other contract."); *see also Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986) (explaining that silence is equivalent to false representation where circumstances impose duty to speak and one deliberately remains silent); *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.*, 237 S.W.3d 379, 385 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ("Fraud by omission is a subcategory of fraud because an omission or non-disclosure may be as misleading as a positive misrepresentation of fact when a party has a duty to disclose."). Question 14 provided:

> Did any of the parties listed below commit fraud against Gordon Westergren?

---

[17] Question 13 covered fraud by affirmative misrepresentation, question 14 covered fraud by omission, and question 15 covered statutory fraud involving real estate. Question 19, the damages question associated with the fraud claims, was predicated on an affirmative answer to question 13 or 15.

[18] The trial court previously had denied the Plank Parties' motion for summary judgment based on the Release.

19

Fraud occurs when:

  a) a party fails to disclose a material fact within the knowledge of the party,

  b) the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth,

  c) the party intends to induce the other party to take some action by failing to disclose the fact, and

  d) the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

On question 14, the jury answered "yes" with respect to each of NPH, Michael Plank, and Russell Plank. We disagree that Westergren failed to present any evidence of fraud by omission. Russell Plank testified that the Release was drafted by the Plank Parties' attorneys, not by Westergren, and Russell Plank read and approved it before having Westergren sign it. Westergren testified that Russell Plank called him and told him that he should come to the NPH office to pick up the first half of the million dollars. Russell Plank was aware that Westergren had "eyesight problems." Westergren testified that he did not take his reading glasses when he went to pick up his check, that Westergren could not read the document Russell Plank "needed" him to sign, but after Westergren asked Russell Plank "[w]hat's that?", Russell Plank told Westergren he was signing "nothing," "just a receipt," and he did not "have to worry about it." Westergren testified what Russell Plank did not tell him was that the document was a "release of all claims." Westergren testified he "absolutely" relied on the fact that Russell Plank told Westergren the document was "just a receipt" without telling him it was a release in executing and signing the Release. Russell Plank testified, "We put things in [the Release] because we—we just didn't—we didn't—Gordon was a loose cannon. We had no idea what he was capable of." Westergren testified that as he left this meeting, Russell Plank told Westergren he would receive "the other half"

20

when "we get another building coming out of the ground." Westergren did not know that what he signed was a release until he met with Michael Plank who told him "you need to read what you sign" and that he would not pay Westergren "an f'ing dime" more. Westergren never received the other $500,000 and 5% profit interest.

In addition, Russell Plank, after working directly with the Plank Parties' attorneys on drafting the Release, never provided Westergren's attorney Langston with a copy of the Release before asking Westergren to sign it. This is despite the facts that Russell Plank knew Langston represented Westergren in legal matters related to the 190 acres, Russell Plank personally had written a $5000 check to pay Westergren's attorney's fees in connection with the 190 acres, and Langston had "many thousand[s]" of discussions with Russell Plank about putting the oral agreement with Westergren related to the 190 acres—the very reason why Westergren signed the MSA and released his lis pendens—in writing. This is also despite the facts that the document Russell Plank conditioned receiving the $500,000 check on was a "professional" attorney-drafted agreement regarding and release of Westergren's legal claims related to the 190 acres; Russell Plank had his attorneys "put things" in the Release because he "had no idea what [Westergren] was capable of"; and that the custom and practice of communications among attorneys is to deal strictly with the attorney representing "the other guy's client," which includes providing that attorney with copies of documents. Langston testified that he was unable to advise Westergren about his legal rights under the document because he did not receive a copy of it until almost a year after Westergren signed it, and that the first thing Langston said when he read the Release was "[s]omething like, Oh my god." Although Westergren generally was a "handshake" deal man, Russell Plank certainly knew Westergren had retained

21

counsel for matters related to the 190 acres. Russell Plank's actions in connection with the Release thus provide ample circumstantial evidence of his intent to defraud Westergren. *See Anderson, Greenwood & Co. v. Martin*, 44 S.W.3d 200, 215 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

In their JNOV motion, the Plank Parties cited *First City Mortgage Co v. Gillis*, for the proposition that Russell Plank had no duty as a fiduciary to disclose the Release's unambiguous terms and Westergren was obligated as a principal to read the Release before he signed it. *See* 694 S.W.2d 144, 146–47 (Tex. App.— Houston [14th Dist.] 1985, writ ref'd n.r.e.).[19] However, in *First City Mortgage*, we expressly recognized fraud as a possible basis to excuse a party's obligation to read a document prior to signing. *Id.* at 147 ("If no fraud is involved, one who signs an agreement without knowledge of its contents is presumed to have consented to its terms and is charged with knowledge of the agreement's legal effect.").[20] Moreover, there need not be a fiduciary relationship between the parties to support fraud by omission.[21] *See Solutioneers Consulting*, 237 S.W.3d at

---

[19] *First City Mortgage* involved a broker-principal fiduciary relationship in the context of an attempt to secure financing.

[20] In their appellate brief, the Plank Parties also rely on *Bradford v. Vento*, where the Texas Supreme Court concluded that the plaintiff's fraud-by-omission claim failed because there was no evidence that the defendant "knew that [the plaintiff] lacked information and did not have 'an equal opportunity to discover the truth.'" 48 S.W.3d 749, 756 (Tex. 2001). *Bradford* is distinguishable because, here, after coming in to purportedly receive the first half of the million dollars, Westergren expressly asked Russell Plank what Westergren was signing, and there was evidence that Westergren had not brought his reading glasses and that Russell Plank knew Westergren needed glasses to read documents. Further, the fact that Russell Plank proceeded to joke about Westergren's not spending all of the $500,000 check quickly just in case Russell Plank would not be able to give Westergren his other half—after Westergren already had signed the Release—constitutes evidence that Russell Plank knew Westergren was ignorant of and lacked information about the Release's terms. And the fact that, after consulting with the Plank Parties' own attorneys on the Release, Russell Plank did not provide Westergren's attorney with a copy of the Release reasonably supports an inference that Russell Plank knew Westergren did not have an "equal opportunity to discover the truth" of the Release's terms.

[21] In their JNOV motion, the Plank Parties did not argue that Westergren failed to show

22

385 (explaining that duty to disclose also may arise "when one party voluntarily discloses information, which gives rise to the duty to disclose the whole truth," "when one party makes a representation, which gives rise to the duty to disclose new information that the party is aware makes the earlier representation misleading or untrue," or "when one party makes a partial disclosure and conveys a false impression, which gives rise to the duty to speak"). Where Russell Plank, individually, and Westergren had entered into an alleged oral agreement; where Russell Plank had made representations that he would pay Westergren $1 million and a 5% profit interest in the sale of the 190 acres; where Russell Plank knew that Westergren was represented by counsel in matters related to the 190 acres; where Russell Plank had directly worked with his attorneys to draft a document that would release all of Westergren's claims in the 190 acres; where Russell Plank did not provide a copy of the Release to Langston; and where Russell Plank answered Westergren's direct question as to what he was signing with it was a "just a receipt" for the $500,000 and did not tell him it actually included a release of all claims, Russell Plank had a duty to disclose that he would pay only $500,000 for Westergren's releasing all his claims as the whole truth, because he was aware this new information made his earlier representations misleading or untrue, and to avoid conveying a false impression *See id.*

Here, the evidence indicates that Russell Plank called Westergren in to receive the first half of his "cool million"; presented Westergren with a document "drawn by professionals" and that Russell Plank had approved without first sending a copy to Westergren's attorney for his review; told Westergren that he "needed" to sign it; after being expressly asked by Westergren what he was signing, told him it was "just a receipt" and did not disclose that it was an agreement

---

any other basis for Russell Plank's duty to disclose.

and included a release of all claims; and continued to refer to the existence of the oral agreement he had with Westergren even after the Release was signed. From Russell Plank's actions, a reasonable jury was free to infer he knew and had concealed or failed to disclose the material fact that the document was a release of Westergren's claims; he knew Westergren did not know that the document was a release and did not have an equal opportunity to discover the truth; he intended to induce Westergren to sign the Release by deliberately failing to disclose that fact; and Westergren was injured by signing the document without knowing it was a release. In other words, that Russell Plank induced Westergren into signing the Release by committing fraud by omission or nondisclosure. Therefore, based on our review of the evidence in the light most favorable to, and indulging every reasonable inference that would support, the jury's affirmative finding, we conclude there is more than a scintilla of evidence upon which a reasonable and fair-minded jury could conclude Westergren had proven each of the elements of fraud by omission as to Russell Plank. *See City of Keller*, 168 S.W.3d at 823, 827.[22] Because we conclude that there is legally sufficient evidence to support

---

[22] Because we conclude that there is legally sufficient evidence to support the jury's affirmative finding on fraud by omission with regard to Russell Plank and this jury finding serves in support of Westergren's defense to the Release, to finally dispose of this appeal, we need not address the Plank Parties' contention on JNOV that even if the jury's findings on fraud by misrepresentation within another fraud question could support Westergren's fraudulent-inducement defense, Westergren justifiably could not rely on the alleged "receipt" misrepresentation as a matter of law because he failed to read the Release. *See* TEX. R. APP. P. 47.1. In any event, this situation is distinguishable from that addressed by the en banc court in *DRC Parts & Accessories, L.L.C. v. VM Motori, S.p.A.*, because there the plaintiff alleged the defendant breached the written contract at issue and, in the alternative, alleged that the defendant fraudulently induced it to enter into that contract through affirmative misrepresentation. 112 S.W.3d 856, 856 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). There was no dispute that the parties "agreed to continue the relationship" in the form of a written agreement. *Id. Harvey v. Elder*, cited by the dissent but not the Plank Parties, also does not control in these circumstances because there the patient who signed the release of claims at issue testified she was aware "that [the doctor] had prepared a release" of her payment note and that the notary asked her before she signed if she understood the document, and she replied she did. 191 S.W.2d 686, 689 (Tex. Civ. App.—San Antonio 1945, writ ref'd). Moreover, there is no

24

Westergren's defense of fraudulent inducement to the Release, this subground also does not provide a basis for affirming the trial court's judgment on breach of contract. *See Sbrusch*, 818 S.W.2d at 394.

indication the patient required glasses to read what she signed, that the patient expressly asked the doctor what she was signing, or that the doctor described the document as "*just* a receipt" and "nothing." Nor was the patient already represented by counsel in matters connected to the claims she released. In contrast, Westergren's position—as his defense to the Release—is that he did not even know he was entering into any written agreement, much less a release of his claims related to the 190 acres, due to Russell Plank's fraud. A party is not charged as a matter of law with knowledge of a document's unread provisions where "he can demonstrate that he was tricked into its execution." *See DeClaire v. G & B McIntosh Family Ltd. P'ship*, 260 S.W.3d 34, 47 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (citing *Town North Nat'l Bank v. Broaddus*, 569 S.W.2d 489, 492 (Tex. 1978)). Moreover, justifiable reliance generally is a question of fact. *See 1001 McKinney Ltd. v. Credit Suisse First Boston Mortg. Capital*, 192 S.W.3d 20, 30 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). Here, Westergren testified, and the jury reasonably could have concluded, that Westergren justifiably relied on Russell Plank's "trickery" in failing to disclose that what Westergren was signing included a release of all claims, and was not "just a receipt," after Westergren expressly asked Russell Plank what he was signing, when it answered "yes" to question 14. And one need not show that he was prevented from reading or physically forced to sign a contract to successfully assert fraudulent inducement. *See Amouri v. Sw. Toyota, Inc.*, 20 S.W.3d 165, 170 (Tex. App.—Texarkana 2000, pet. denied) (plaintiff did not read but signed lease thinking he bought vehicle). The Plank Parties' other cited cases are likewise distinguishable. *See In re Lyon Fin. Servs.*, 257 S.W.3d 228, 232 (Tex. 2008) (plaintiff admitted awareness of the forum-selection clause but claimed relator had represented it only applied to portion of agreement not sued upon); *In re MHI P'ship, Ltd.*, No. 14-07-00851-CV, 2008 WL 2262157, at *3, 5 (Tex. App.—Houston [14th Dist.] May 29, 2008, orig. proceeding, no pet.) (mem. op.) (homeowners admitted awareness of arbitration provisions in earnest money contracts; also noting "strongly favored status" of arbitration). Further, the written agreement in *Lyon Financial*, unlike the Release, "clearly set[] out that there were no representations between the parties not set out in the agreement." *See* 257 S.W.3d at 232.

Similarly, in concluding that legally sufficient evidence exists to support Westergren's fraudulent-inducement defense, we presumed the Release to be valid and thus need not address the Plank Parties' contention on JNOV that the Release covered Russell Plank as a matter of law to finally dispose of this appeal. *See* TEX. R. APP. P. 47.1. In any event, while Michael Plank and NPH and their agents are specifically mentioned in the Release, Russell Plank is not. Further, Russell Plank admitted that he was "not a party individually" to the Release, and that while the Release mentioned "entities that I work with . . . and represent, . . . I'm not written on here. I'm not personally drawn." Viewing the evidence in the light most favorable to the jury's finding that Russell Plank acted and was bound in his individual capacity on the oral agreement, and where the evidence indicates Russell Plank continued to wear his "individual" hat in his dealings with Westergren, we cannot agree with the Plank Parties that the Release covered Russell Plank as a matter of law to preclude Westergren's fraudulent-inducement defense and void the jury's affirmative finding.

25

## 4. The evidence is legally sufficient to support that consideration existed for Russell Plank's contract with Westergren.

In their motion for JNOV, the Plank Parties argued any alleged oral agreement reached after the execution of the MSA fails for lack of consideration.[23] On appeal, Westergren contends that the evidence does not show the oral agreement with Russell Plank was reached after the MSA, but rather the agreement predated the MSA and was Westergren's only incentive to agree to the MSA.

Generally, a contract must be supported by consideration to be enforceable. *McLernon v. Dynegy, Inc.*, 347 S.W.3d 315, 335 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (citing *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 659 (Tex. 2006)). Consideration consists of either a benefit to the promisor or a detriment to the promisee. *See Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991). It is a present exchange bargained for in return for a promise. *Id.* It may consist of some right, interest, or profit, or benefit that accrues to one party, or, alternatively, of some forbearance, loss or responsibility that is undertaken or incurred by the other party. *Angelou v. African Overseas Union*, 33 S.W.3d 269, 280 (Tex. App.—Houston [14th Dist.] 2000, no pet.).

Here, Westergren testified that Russell Plank promised to make Westergren his partner and pay Westergren $1 million and a 5% profit interest in the sale of the 190 acres in exchange for Westergren's promise to release his lis pendens and contractual rights to the 190 acres. Westergren presented evidence that Russell Plank's promises induced Westergren, to his detriment, to agree in the MSA to

---

[23] In their appellate brief, the Plank Parties apparently recognize that their JNOV argument and cited cases do not apply because Westergren "conceded" that the alleged promise by Russell Plank predated the MSA. However, because in their motion for JNOV, the Plank Parties asserted that the contract claim fails "because any contract was unenforceable for lack of consideration" and because the trial court did not specify upon what ground it decided to grant JNOV, we consider whether any oral agreement predating the MSA is supported by consideration.

release his lis pendens and his contractual rights to the 190 acres and then to actually release the lis pendens and dismiss the 190-acres litigation with prejudice. According to Westergren, Russell Plank's promises "caused [Westergren] to give them control of the property" and induced him to "walk away" from the mediation "without getting anything"—"[W]e had a partnership, a deal to march on down. That's why I took zero." Langston testified that both Westergren and Russell Plank provided "identical" details regarding their agreement and exchange of promises.

The jury found that Russell Plank agreed to pay Westergren $1 million and a 5% profit interest in the 190 acres in exchange for Westergren's releasing his lis pendens and giving up his contractual right to the property. Based on our review of the evidence in the light most favorable to this finding, we conclude the evidence at least raised a fact issue as to the existence of consideration, which would allow a reasonable and fair-minded jury to find that a contract existed. *See City of Keller*, 168 S.W.3d at 823, 827. Thus, this ground does not provide a basis for affirming the trial court's judgment on breach of contract. *See Sbrusch*, 818 S.W.2d at 394.

### 5. The evidence is legally sufficient to support that the oral agreement entered into by Westergren and Russell Plank did not merge into the MSA.

In their motion for JNOV, the Plank Parties argued that Westergren's contract claim fails as a matter of law because any agreement reached prior to the MSA merged into and was superseded by the MSA. Westergren argues on appeal that the merger doctrine does not apply because Russell Plank individually was not a party to the MSA.

A "merger clause" is a contractual provision mandating that the written

terms of the contract may not be varied by prior agreements because all such agreements have been merged into the new document. *IKON Office Solutions, Inc. v. Eifert*, 125 S.W.3d 113, 125 & n.6 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (concluding statements that document "constitutes the entire agreement concerning the subject matter hereof" and "supercedes prior . . . agreements" were merger clauses). "A merger occurs when the same parties to an earlier agreement later enter into a written integrated agreement covering the same subject matter." *Superior Laminate & Supply, Inc. v. Formica Corp.*, 93 S.W.3d 445, 448–49 (Tex. App.—Houston [14th Dist.] 2002, pet. denied) (citing *Fish v. Tandy Corp.*, 948 S.W.2d 886, 898 (Tex. App.—Fort Worth 1997, writ denied)).

Here, the MSA contains a merger clause: "this Agreement constitutes the entire agreement between and among [the parties], and supersedes any prior or contemporaneous representations, statements, understandings or agreements concerning the subject matter of this Agreement." However, no merger occurred because the parties to the MSA are not the same as those to the oral agreement. While Westergren was a signatory party to the MSA, there is no dispute that Russell Plank individually did not sign and was not a party to the MSA. And we already have determined there is legally sufficient evidence to support that the oral agreement at issue was entered into between Russell Plank, individually, and Westergren. Thus, as a matter of law, the oral agreement and the MSA "cannot merge because the two agreements are between different parties." *See Fish*, 948 S.W.2d at 899.[24] None of the cases cited by the Plank Parties indicates otherwise; indeed, all the agreements at issue involved the *same* exact parties.[25]

---

[24] In *Fish*, the earlier letter agreement at issue was between a corporation and an individual, while the later distribution agreement was between two corporations. 948 S.W.2d at 899.

[25] *Bandera Drilling Co. v. Sledge Drilling Corp.*, 293 S.W.3d 867 (Tex. App.—Eastland

28

Viewing the evidence in the light most favorable to the jury's verdict, we therefore conclude that a reasonable and fair-minded jury was free to conclude that any contract between Westergren and Russell Plank, individually, survived in spite of the MSA. *See City of Keller*, 168 S.W.3d at 823, 827. Thus, this ground does not provide a basis for affirming the trial court's judgment on breach of contract. *See Sbrusch*, 818 S.W.2d at 394.

### 6. The evidence is legally sufficient to support the jury's finding of partial performance.

The Plank Parties asserted in their motion for JNOV that any alleged oral agreement is unenforceable under the statute of frauds because Westergren did not meet his burden to establish the partial-performance exception to the statute of frauds. Specifically, the Plank Parties argued that the evidence conclusively shows Westergren had another reason to release his interest in the 190 acres and the Plank Parties had another reason to pay Westergren, such that there was no evidence their conduct was "unequivocally referable" to the alleged oral agreement. The Plank Parties further argued there was no evidence that enforcement of the statute of frauds would amount to a "virtual fraud."

On appeal, Westergren emphasizes that partial performance is a fact question to be determined by the jury.[26] Westergren argues the evidence shows that he received nothing in the MSA and had no incentive to release his interest other than Russell Plank's oral promises. Further, Westergren contends that the

---

2009, no pet.); *Yasuda Fire & Marine Ins. Co. v. Sompo Japan Ins. Co.*, 225 S.W.3d 894 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *Fisher Controls Int'l, Inc. v. Gibbons*, 911 S.W.2d 135 (Tex. App.—Houston [1st Dist.] 1995, writ denied).

[26] On appeal, Westergren does not argue that the oral agreement is not subject to the statute of frauds at all, but rather that the partial-performance exception applies. Thus, for purposes of our analysis, we presume, without deciding, that the oral agreement would be subject to the statute of frauds, barring any exception.

circumstances surrounding the $500,000 payment, including that the check initially was described for "Land-Fixed Asset," are unequivocally referable to Russell Plank's oral agreement to pay Westergren $1 million plus 5% profit interest.

Partial performance is an exception to the statute of frauds. *Exxon*, 82 S.W.3d at 439. Under the partial-performance exception, an agreement that does not satisfy the statute of frauds but that has been partially performed may be enforced if denying enforcement would itself amount to a virtual fraud. *Id.* Virtual fraud here would mean that because of his reliance on the contract, Westergren has suffered a substantial detriment for which he has no adequate remedy, and the Plank Parties would reap an unearned benefit if permitted to invoke the statute of frauds. *See id.* However, the acts constituting partial performance must be "unequivocally referable to the agreement and corroborative of the fact that a contract actually was made." *Id.* "Actions relied on to establish the partial-performance exception to the statute of frauds must be such as could have been done with no other design than to fulfill the particular agreement sought to be enforced; otherwise, they do not tend to prove the existence of the parol agreement relied on by the plaintiff." *Bookout v. Bookout*, 165 S.W.3d 904, 907–08 (Tex. App.—Texarkana 2005, no pet.) (citing *Exxon*, 82 S.W.3d at 439). The party claiming a partial-performance exception to the statute of frauds generally must secure a jury finding. *Id.* at 908 (citing *Barbouti v. Munden*, 866 S.W.2d 288, 295 (Tex. App.—Houston [14th Dist.] 1993, writ denied)). Whether the performance that has occurred is sufficient to establish the exception is a question of fact. *Id.* at 910.

The jury found that Russell Plank agreed to pay Westergren $1 million and a 5% profit interest in the development of the 190 acres. The jury further found Russell Plank partially performed that agreement.

30

Here, Westergren testified that the only reason he agreed to "walk away" from the mediation for "nothing" and sign the MSA was because Russell Plank had promised to make him a partner and pay him $1 million and a 5% profit interest for releasing his lis pendens and claim to the 190 acres. Russell Plank told Westergren "not to worry," that they just needed to "get these guys out of the way" by way of the mediation and the MSA. Westergren "absolutely" relied on Russell Plank's promises in agreeing to and later signing away his lis pendens. Langston confirmed, "That's what [Westergren] did in reliance on the representations that had been made to him," and that Russell Plank shared these same representations with Langston. As a result of Westergren's signing away his lis pendens, the Plank Parties "got full control" of the 190 acres. NPH (on its own and through a partnership) was able to purchase the 190 acres, received a $6 million distribution from ML Realty Partners, and resold 20 acres at a higher price for square foot. If Westergren successfully had pursued his claim to the 190 acres, he would have "the right to go out and buy the 190 acres." After Westergren released his lis pendens and dismissed his claim, he requested payment on the agreement. Russell Plank told Westergren to come pick up the first half of his $1 million, a "partial payment." Russell Plank did not tell Westergren that he was signing a release when he received a check for $500,000 but instead told him it was "just a receipt." At the time of payment, the check was described in NPH's accounting as for "Land-Fixed Asset"; over five months later, this description was changed to "Consulting Fees." When Westergren left with the check, Russell Plank joked with Westergren that he should not spend all the money too quickly just in case Russell Plank was not "able to give [Westergren] the other half." Russell Plank testified that it was he who convinced Michael Plank to pay the $500,000 to Westergren: "I talked Mike into paying Gordon a half a million dollars." Michael Plank in "no way" wanted to pay any money to Westergren because Westergren

31

did not do "any work" or "anything" to merit being paid. Johnson testified that neither of the Planks ever told him that Westergren was a "consultant," and ML Realty Partners' CEO did not include Westergren on the list of individuals involved "on the NPH side."

### a. Whether Russell Plank's actions are "unequivocally referable" to his contract with Westergren

Considering the evidence in the light most favorable to the jury's partial-performance finding, we conclude that Westergren raised a fact issue on whether Russell Plank's actions were unequivocally referable to their oral agreement. The fact that the $500,000 check was drawn on NPH's bank account is not dispositive because there was clear evidence it was Russell Plank who "pushed" his brother to "try to get [Westergren] paid." *See Bookout*, 165 S.W.3d at 911 (concluding sufficient evidence supported partial performance despite source of check payments at issue).[27] Russell Plank succeeded in his efforts; Michael Plank finally agreed to pay Westergren.

In addition, that NPH's accounting notation on the check later was changed from "Land-Fixed Asset" to "Consulting Fees" does not necessarily mean Russell Plank's conduct in connection with the payment is equally referable to some other contractual arrangement with Westergren. *See id.* (explaining that jury was free to conclude that check payments at issue were evidence of partial performance on contract to purchase chiropractic clinic "notwithstanding the way in which they were marked"). Instead, the evidence indicates NPH did not believe it had any agreement to pay anything to Westergren, for consulting or his "time and effort

---

[27] *Duncan v. F-Star Management, L.L.C.*, relied on by the dissent, is distinguishable. There, neither the sender nor the recipient of the checks at issue was a party to the alleged commission agreements. 281 S.W.3d 474, 482 (Tex. App.—El Paso 2008, pet. denied). Here, Westergren was the check recipient and a party to the alleged oral agreement with Russell Plank. In addition, Russell Plank both approved the payment to Westergren and co-signed the check.

32

related to the [190 acres]." The October 2005 draft profits interest agreement, presented to Westergren by Russell Plank, that mentioned Westergren's providing consulting services for NPH was never signed. Nor did NPH consider Westergren its consultant. Russell Plank indicated Michael Plank was "adamant" Westergren not be paid because "[h]e didn't understand why we had to pay Gordon anything." And Michael Plank specifically admitted "we never had a contract with [Westergren] for anything."[28]

Nor can we view the $500,000 check in isolation. Westergren testified that Russell Plank told him this payment represented only the first half of the "cool million" and joked that Westergren should not spend it all at once in case Russell Plank was unable to "give [him] the other half." And we already have concluded that Westergren presented more than a scintilla of evidence to support his fraudulent-inducement defense to the Release with regard to Russell Plank. Thus, we reject the argument that the $500,000 payment was equally referable to the Release or to any alleged arrangement with NPH.

### b. Whether Westergren's actions are "unequivocally referable" to his contract with Russell Plank

To the extent the Plank Parties also argued that Westergren's actions were not "unequivocally referable" to his contract with Russell Plank, we also conclude Westergren raised a fact issue as to whether his own actions were unequivocally referable to their oral agreement. There is direct testimony from Westergren and

---

[28] Thus, *Resendez v. Maloney*, relied on by the Plank Parties, is distinguishable. No. 01-08-00954-CV, 2010 WL 5395674 (Tex. App.—Houston [1st Dist.] Dec. 30, 2010, pet. denied) (mem. op.). There, the two companies with which the plaintiff alleged he had a ten-year contract admitted that they worked with the plaintiff on an event-by-event basis; thus, the parties' actions were "equally referable" to such arrangement. *Id.* at *8. Likewise, that Michael Plank and NPH disclaimed any contractual arrangement with Westergren and that Westergren never admitted performing any consulting services for the Plank Parties distinguishes the additional cases discussed by the dissent.

33

Langston that Russell Plank's representations induced Westergren to sign the MSA. While the MSA contained a merger clause, we already have determined that no merger occurred as to Russell Plank individually. And the MSA's reliance disclaimer would not apply to any representations by Russell Plank individually.[29] The evidence thus raised a fact issue as to whether Westergren fully performed on his promise to Russell Plank individually by releasing his lis pendens and claim to the 190 acres.

### c. Whether permitting Russell Plank to escape liability would amount to a "virtual fraud"

We also conclude that Westergren raised a fact issue on whether the failure to enforce the oral agreement would result in a "virtual fraud." Westergren and his attorney both testified that Westergren acted in reliance on the contract with Russell Plank to his substantial detriment, giving up his right to otherwise purchase and develop the 190 acres, a site that had attracted several real estate developers. There is also evidence that Russell Plank would reap an unearned benefit if permitted to plead the statute of frauds. Essentially, NPH was able to purchase the entire 190 acres—receiving a $6 million distribution from ML Realty Partners, and selling a 20-acre parcel for over two and half times its purchase price. As paid consultant for NPH, Russell Plank clearly stood to benefit from this "massive" project.

### d. Here, the jury was free to determine whether the partial-performance exception applied.

Based on our review of the evidence in the light most favorable to the jury's findings, we conclude more than a scintilla of evidence exists to support that the parties' performance here sufficiently established the partial-performance

---

[29] "No representations warranties or inducements have been made to any party *by any other party* concerning this Agreement . . . ." (Emphasis added).

exception to the statute of frauds. *See Tanner*, 289 S.W.3d at 830. Therefore, a reasonable and fair-minded jury was free to answer "yes" with regard to Russell Plank on the partial-performance question. *See City of Keller*, 168 S.W.3d at 823, 827. Thus, this ground does not provide a basis for affirming the trial court's granting JNOV on breach of contract. *See Sbrusch*, 818 S.W.2d at 394.

### 7. The evidence is legally sufficient to support the jury's damages finding on breach of contract.

As discussed *supra* in Section IV.A.1, the Plank Parties urged in their JNOV motion that because there is no legally sufficient evidence of partial performance, all of the jury's damages findings fail. The Plank Parties did not argue specifically, until after the trial court entered its judgment, that even if the partial-performance exception applied, Westergren would not be entitled to any damages based on a benefit-of-the-bargain measure. Therefore, we concluded that Westergren did not waive his JNOV complaint by failing to address this particular issue on appeal.

Even assuming the Plank Parties fairly had presented this issue, we conclude that the jury properly could award Westergren damages on his breach-of-contract claim. True, in *Exxon*, the court concluded in dicta that even if successful in removing the oral agreement at issue from the statute of frauds because of partial performance, the plaintiff only would be entitled to reliance damages. 82 S.W.3d at 441. But this conclusion is suspect because the *Exxon* court simply extended, without any analysis, the rule that a party may only recover reliance damages in cases involving application of the promissory-estoppel exception to the statute of frauds. *See id.*[30] Moreover, *Exxon* is not on point because there was no evidence

---

[30] *Wheeler v. White*, 398 S.W.2d 93 (Tex. 1966), relied on by the Plank Parties in their appellate brief, directly involved a promissory-estoppel claim.

35

of full performance by the party seeking to enforce the agreement.

Here, not only did Russell Plank partially perform, but also Westergren fully performed. When there is full performance by one party and partial performance by the other party, the contract no longer falls under the statute of frauds and may be enforced in law (and not simply as a matter of equity). Thus, Westergren can obtain his benefit-of-the-bargain damages. *See Davis v. Insurtek, Inc.*, No. 05-09-01029-CV, 2010 WL 5395668, at *4 n.3 (Tex. App.—Dallas Dec. 30, 2010, no pet.) (mem. op.) (noting fundamental difference between principles of full and part performance, and that full performance by one party takes case out of statute of frauds entirely). When one party fully performs a contract, the statute-of-frauds defense is unavailable to the second party if he knowingly accepts the benefits and partially performs. *Sheffield v. Gibson*, 14-06-00483-CV, 2008 WL 190049, at *2 (Tex. App.—Houston [14th Dist.] Jan. 22, 2008, no pet.) (mem. op); *Parks v. Landfill Mktg. Consultants, Inc.*, No. 14-02-01243-CV, 2004 WL 1351545, at *5 (Tex. App.—Houston [14th Dist.] June 17, 2004, pet. denied) (mem. op.); *see also Machann v Machann*, 269 S.W.2d 826, 828 (Tex. Civ. App.—Waco 1954, writ ref'd n.r.e.) ("Where a contract is executed on one side and nothing remains but the payment of the consideration, this may be recovered notwithstanding the Statute of Frauds."). Because Westergren fully performed, the only thing left was for him to be paid the agreed-upon consideration—in other words, for him to receive the remainder of his benefit of the bargain, just as Russell Plank already had.[31]

---

[31] Many of our treatises on contracts and the statute of frauds note this essential distinction. *See, e.g.*, RESTATEMENT (FIRST) OF CONTRACTS § 219 (1932) (full performance has the same effect as if statute of frauds had been satisfied); 37 C.J.S. *Statute of Frauds* § 190 (2010) (party who has completely performed can sue under law for benefit of the bargain); 41 TEX. JUR. 3D *Statute of Frauds* § 115 (2012) (part performance is ordinarily regarded as a strictly equitable doctrine, available in equity courts only, whereas complete performance by one party is frequently regarded as taking the contract out of the statute, even in an action at law); 41 TEX. JUR. 3D *Statute of Frauds* § 117 (2012) (when one party has fully performed and other party

The jury found damages in favor of Westergren on his breach-of-contract claim against Russell Plank in the amount of $500,000—"[t]he difference, if any, between the amount Gordon Westergren received from the Defendants and the amount he would have received if the Defendants had paid him the agreed[-]upon amount." We already have concluded there is legally sufficient evidence from which a reasonable jury could have found that Russell Plank partially and Westergren fully performed their respective ends of the agreement. Russell Plank's partial performance related to paying the first half of the $1 million due Westergren, and Westergren testified that he was still owed the other $500,000, as well as a 5% profit interest in the development of the 190 acres. Viewing the evidence in the light most favorable to the jury's damages finding, we thus conclude that more than a scintilla of evidence exists to support a reasonable and fair-minded jury's award of $500,000 in contract damages. *See Tanner*, 289 S.W.3d at 830; *City of Keller*, 168 S.W.3d at 823, 827. Thus, even if fairly presented, this ground does not provide a basis for affirming the trial court's granting JNOV on breach of contract. *See Sbrusch*, 818 S.W.2d at 394.

### 8. The evidence does not conclusively establish the Plank Parties' affirmative defenses to Westergren's contract claim.

When a movant for JNOV challenges an adverse finding on an affirmative defense, it must conclusively establish all vital facts in support of that defense. *Mosqueda v. G & H Diversified Mfg., Inc.*, 223 S.W.3d 571, 576 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (citing *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001)). The Plank Parties argued in their motion for JNOV the trial court should disregard the jury's finding that Russell Plank's failure to comply was not excused "because the evidence conclusively established the

partially has performed, the fully performing party is entitled to full consideration under contract).

37

affirmative defenses of waiver, prior material breach, and quasi-estoppel." On appeal, Westergren complains that the Plank Parties did not support this issue with any record or case citations, and thus did not meet their burden of proof.

The jury found that Russell Plank's failure to comply was not excused by waiver, prior material breach, or quasi-estoppel. With regard to waiver, we already have concluded that the evidence presents at least a fact issue as to whether Westergren released any claims against Russell Plank in the MSA and the Release. *See supra* Section IV.A.3. Thus, even if the Plank Parties had pointed to specific evidence in support, it would not conclusively establish all vital facts for this defense. *See Dow Chem.*, 46 S.W.3d at 241–42. With regard to prior material breach, the only arguable bases for any such breach by Westergren would be the MSA and the Release, so again the Plank Parties could not have met their burden. And finally, the only arguable bases for a quasi-estoppel defense also relate to Westergren's position taken in the MSA or the Release. Therefore, because the Plank Parties have the burden of proof on their affirmative defenses, and because they failed to prove they were entitled to them as a matter of law, we conclude that we cannot sustain JNOV on this ground. *See Sbrusch*, 818 S.W.2d at 394.

**9. The evidence is legally sufficient to support the existence of an agreement between Westergren and Russell Plank, that Russell Plank failed to comply with that agreement, and that Westergren suffered damages of $500,000 as a result.**

We already have addressed most aspects of this ground elsewhere. In sum, Westergren and Langston both testified regarding Russell Plank's promise to pay Westergren $1 million and a profit interest (ultimately set at 5%) in the development of the 190 acres. There is no dispute that Westergren only received a check in the amount of $500,000, and Russell Plank did not pay Westergren anything beyond the $500,000. Thus, viewing the evidence in the light most

favorable to the jury's findings, and indulging every reasonable inference to support them, we conclude that more than a scintilla of evidence exists to support the findings that an agreement existed, that Russell Plank breached it, and that Westergren suffered damages of $500,000. *See Tanner*, 289 S.W.3d at 830; *City of Keller*, 168 S.W.3d at 823, 827. Having concluded that we cannot uphold the trial court's judgment on any of the grounds asserted in the Plank Parties' motion for JNOV with regard to breach of contract, we conclude that Westergren has met his burden to show error and we sustain his first issue. *See Sbrusch*, 818 S.W.2d at 394. Thus, we reverse the trial court's judgment as it pertains to—and we reinstate—the jury's findings related to Westergren's breach-of-contract claim on questions 1, 2, 4, and 5, and partially reinstate the jury's findings on questions 3 and 14 only with regard to Russell Plank.

### 10.We must remand for a new trial on Westergren's attorney's fees.

Having concluded that Westergren is entitled to reversal and reinstatement of the jury's findings related to his contract claim, we consider whether we also can reinstate the jury's award of $200,000 for attorney's fees for trial, and contingent fees of $25,000 for this appeal and $20,000 for a petition of review to the Texas Supreme Court.[32] The Plank Parties in their motion for JNOV argued that the jury's attorney's fee award was improper because no evidence supported the specific amount awarded and because Westergren's counsel admitted that he did not segregate fees among contract and tort claims. On appeal, Westergren contends that the amount awarded is within the range supported by the evidence and that segregation is not required where services are rendered in connection with claims arising out of the same transaction and are so interrelated that prosecuting and defending them entail the same facts. Setting aside the propriety of the

---

[32] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (West 2011).

39

specific amount awarded, we conclude Westergren has not met his burden to demonstrate that fee segregation is not required.

Generally, a party seeking attorney's fees must segregate fees incurred in connection with a claim that allows their recovery from fees incurred in connection with claims for which no such recovery is allowed. *CA Partners v. Spears*, 274 S.W.3d 51, 81 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). Texas courts recognize an exception to this general rule. *Id.* (citing *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006)). When discrete legal services advance both recoverable and unrecoverable claims, attorneys are not required to segregate fees to recover the total amount covering all claims. *Id.* (citing *Chapa*, 212 S.W.3d at 313). In this situation, the claims are said to be "intertwined," and the mere fact that attorney's fees are incurred in advancing both recoverable and unrecoverable claims does not render those fees unrecoverable. *Id.* (citing *Chapa*, 212 S.W.3d at 313–14). But if any attorney's fees relate solely to a claim for which fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees. *Id.* at 82 (citing *Chapa*, 212 S.W.3d at 313). "[T]he evidence of the amount of recoverable attorney's fees is sufficiently segregated if, for example, the attorney testifies that a given percentage of the drafting time would have been necessary even if the claim for which attorney's fees are not recoverable had not been asserted." *Id.* (citation omitted). The party seeking to recover attorney's fees carries the burden of demonstrating that fee segregation is not required. *Id.*

The only testimony provided by Westergren's attorney was that he had not segregated any fees among claims for which fees are recoverable versus unrecoverable because he did not think it was "necessary." Notwithstanding Westergren's argument that the facts are interrelated, the Texas Supreme Court expressly has held "[i]ntertwined *facts* do not make tort fees recoverable." *Id.* at

40

83 (quoting *Chapa*, 212 S.W.3d at 313). Instead, the focus is whether the legal work performed pertains solely to claims for which attorney's fees are unrecoverable. *Id.* (citing *7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys., Inc.*, 245 S.W.3d 488, 509 (Tex. App.—Houston [14th Dist.] 2007, pet. denied)). This does not mean examining the work product as a whole, but rather parsing it into component tasks. *Id.* (citing *7979 Airport Garage*, 245 S.W.3d at 509).

While Westergren's contract and tort claims may have involved developing some of the same facts and presenting some of the same evidence, Westergren has failed to present evidence that his partnership and fraud claims did not require any solely separate drafting, legal research, or discovery. *See id.* at 84. Therefore, Westergren has failed to demonstrate that segregation of fees is not required. However, Westergren did not forfeit his right to recover attorney's fees by failing to segregate them, and "[t]he evidence he presented regarding the total amount of attorney's fees he incurred is some evidence of what the segregated amount should be." *See id.* Therefore, we reverse that portion of the trial court's judgment disregarding the jury's finding on Westergren's attorney's fees, and remand for a new trial on attorney's fees. *See id.* at 81, 84 (citing *A.G. Edwards & Sons, Inc. v. Beyer*, 235 S.W.3d 704, 710 (Tex. 2007)).

## B. Whether the trial court erred in disregarding the jury's partnership and fraud findings

In issues two and three, Westergren argues that the trial court erred in disregarding the jury's findings in his favor on his partnership and affirmative fraud claims. With regard to Westergren's partnership claims, the jury awarded him $177,608, or "[t]he difference, if any, between the amount Gordon Westergren received from the Defendants and the amount he would have received if the Defendants had paid him the agreed[-]upon amount." With regard to Westergren's

fraud-by-misrepresentation and statutory fraud claims, the jury awarded him zero dollars, or "[t]he difference, if any, between the amount Gordon Westergren received from the Defendants and the amount he would have received if the Defendants had paid him the agreed[-]upon amount." In the contract damages question, the jury awarded Westergren $500,000 as "[t]he difference, if any, between the amount Gordon Westergren received from the Defendants and the amount he would have received if the Defendants had paid him the agreed[-]upon amount." Thus, for each of his theories of liability, Westergren alleged, and the jury was asked the same measure of damages for, a single financial injury—the remaining benefit of the bargain due to him.

Under the one-satisfaction rule, a claimant is entitled to only one recovery for any damages suffered. *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000) (citing *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991)). The rule applies when different parties commit the same act or when different acts cause the same injury. *Id.* "'There can be but one recovery for one injury, and the fact that . . . there may be more than one theory of liability[ ] does not modify this rule.'" *Chapa*, 212 S.W.3d at 303 (quoting *Stewart Title Guar. Co.*, 822 S.W.2d at 8)). When a party tries a case on alternative theories of recovery and a jury returns favorable findings on two or more theories, we should render judgment on the finding affording the greatest recovery. *Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 367 (Tex. 1987); *Murphy v. Seabarge, Ltd.*, 868 S.W.2d 929, 938 (Tex. App.—Houston [14th Dist.] 1994, writ denied). This rule applies in the context of submission of overlapping contract and tort claims. *Cottman Transmission Sys., L.L.C. v. FVLR Enters., L.L.C.*, 295 S.W.3d 372, 379 (Tex. App.—Dallas 2009, pet. denied).

In this case, the jury was asked the same measure of damages on each of

42

Westergren's theories of liability and awarded him the greatest recovery for his contract cause of action.[33]  Because we reverse and reinstate the jury's findings regarding the contract claim, we need not address Westergren's issues regarding the tort claims.  *See id.* (applying one-satisfaction rule where plaintiff was awarded actual damages on contract claim, and same damages for fraud, negligent-misrepresentation, and promissory-estoppel claims).

## C. Whether the trial court abused its discretion in denying Westergren leave to amend his petition

In his fourth issue, Westergren asserts that the trial court abused its discretion in denying him leave to amend his petition during trial to plead lack of consideration as an affirmative defense to the MSA.  Because we already have sustained Westergren's first issue to reinstate the jury's findings in his favor regarding his contract claim, we need not address this issue to finally dispose of this appeal.  *See* TEX. R. APP. P. 47.1.

## D. Whether the trial court abused its discretion in its award of costs

Both Westergren and the Plank Parties requested court costs in the trial court.  In its final judgment, the trial court awarded court costs to the Plank Parties.

Rule 131 of the Texas Rules of Civil Procedure provides "[t]he successful party to a suit *shall* recover of his adversary all costs incurred therein, except where otherwise provided." TEX. R. CIV. P. 131 (emphasis added).  A "successful party" under the rules is one that obtains a judgment vindicating a civil right. *Perez v. Baker Packers*, 694 S.W.2d 138, 143 (Tex. App.—Houston [14th Dist.]

---

[33] The trial court refused Westergren's request to award profits disgorgement.  However, whether in equity to award, and the amount of any, profits disgorgement is within the trial court's discretion.  *See Burrow v. Arce*, 997 S.W.2d 229, 237 (Tex. 1999).  Thus, Westergren does not argue that the trial court was required to order disgorgement.

1985, writ ref'd n.r.e.). We review a trial court's allocation of costs for abuse of discretion. *Univ. of Houston–Clear Lake v. Marsh*, 981 S.W.2d 912, 914 (Tex. App.—Houston [1st Dist.] 1998, no pet.).

Because the trial court's award of court costs to the Plank Parties was likely predicated on its erroneous granting of JNOV in their favor, and in view of our rulings,[34] because the only proper successful party is Westergren, we conclude that the trial court abused its discretion in its allocation of costs. Thus, we reverse the portion of the trial court's judgment awarding the Plank Parties their court costs and remand to the trial court to impose costs consistent with this opinion.[35] *See Jordan v. Bustamante*, 158 S.W.3d 29, 43-44 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (reversing and remanding to trial court for reallocation of costs where party was successful on appeal).

### E. Whether the evidence is legally and factually sufficient to support the jury's failure to find that Westergren breached the MSA or the Release

In the two issues presented in their cross-appeal, the Plank Parties assert that the evidence is legally insufficient or, in the alternative, factually insufficient to support the jury's failure to find that Westergren breached the MSA or the Release. The Plank Parties argue the evidence conclusively establishes that Westergren breached each of these contracts by filing this lawsuit against the Plank Parties, resulting in $729,487.54 in damages ($704,961.10 in reasonable attorney's fees and $24,526.44 in costs and expenses incurred by the Plank Parties in defending this lawsuit). For the purposes of our analysis, we presume, without deciding, that at least one claim asserted by Westergren in this lawsuit is within the scope of the MSA and the Release. Notwithstanding our conclusion that the evidence is legally

---

[34] *See supra* Section IV.A and *infra* Section IV.E.

[35] Westergren submitted to the trial court a bill of costs in the amount of $12,284.78.

sufficient to support the jury's finding that Russell Plank's failure to comply with the oral agreement was not excused, and the jury's finding that Russell Plank committed fraud by omission to support Westergren's fraudulent-inducement defense to the Release, we also presume, solely for purposes of our analysis, that the MSA and the Release are each binding and enforceable against Westergren.

The analysis of these cross-issues requires us to interpret the MSA and the Release to determine if either contract imposes an obligation on Westergren not to file suit on any of the claims released by Westergren. Both the MSA and the Release contain release provisions. Releases are subject to the usual rules of contract construction. *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 848 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (op. on reh'g). In construing contracts, our primary concern is to ascertain and give effect to the intentions of the parties as expressed in the contract. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Ins. Co. of N. Am.*, 955 S.W.2d 120, 127 (Tex. App.—Houston [14th Dist.] 1997), *aff'd sub nom., Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 20 S.W.3d 692 (Tex. 2000). To ascertain the parties' true intentions, we examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999). Whether a contract is ambiguous is a question of law for the court. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). When a written contract is worded so that it can be given a certain or definite legal meaning or interpretation, it is unambiguous, and the court construes it as a matter of law. *Nat'l Union Fire Ins. Co.*, 955 S.W.2d at 128. We cannot rewrite the contract or add to its language under the guise of interpretation. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003).

Under the MSA, Westergren agrees to "release" and "discharge" the claims in question and to release any notice of lis pendens that he has filed against the 190 acres. Under the Release, Westergren "does hereby fully and unconditionally release and forever relinquish" various rights, titles, and interests, and Westergren also "does hereby fully and unconditionally remise, release and forever discharge" various claims. Neither of these contracts contains any language in which Westergren indemnifies, holds harmless, protects, or defends any of the Plank Parties. These contracts do not contain any language in which the parties agree that any of the released parties may recover their attorney's fees and defense costs against Westergren if he files suit based upon any of the released claims. Nor do these contracts contain any language in which Westergren expressly agrees, promises, or covenants that he will not file suit based upon any of the released claims. *See Watson v. Houston Indep. Sch. Dist.*, No. 14-03-01202-CV, 2005 WL 1869064, at *4 (Tex. App.—Houston [14th Dist.] Aug. 9, 2005, no pet.) (mem. op.) (concluding that "nothing in the contract represents a clear, express waiver of [plaintiff's] right to sue [defendant] for alleged violations of the law").

The Plank Parties do not assert that either contract contains such language. Instead, the Plank Parties argue that a release constitutes a promise not to bring a lawsuit based upon the released claims. The Plank Parties essentially argue that, by agreeing to release and discharge certain claims, a party necessarily and implicitly agrees that he will not file suit based upon any of the released claims. Under this proffered construction, the plain meaning of the release language in the MSA and the Release would include a promise not to file suit based upon any of the released claims. We conclude that this construction is not a valid one.

A release of claims operates to discharge the released parties from these claims and to extinguish these claims against the released parties as effectively as

46

would a prior judgment between the parties. *See El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.*, 8 S.W.3d 309, 314 n.15 (Tex. 1999); *Dresser Indus. v. Page Petroleum*, 853 S.W.2d 505, 508 (Tex. 1993); *Lehmann v. Har-Con Corp.*, 76 S.W.3d 555, 565 (Tex. App.—Houston [14th Dist.] 2002, no pet.). Therefore, a release of a claim is an absolute bar to any right of action by the releasing party on the claim, and a release is an affirmative defense in a lawsuit in which the releasing party asserts a released claim. *See Dresser Indus.*, 853 S.W.2d at 508; *Lehmann*, 76 S.W.3d at 565. On the other hand, an indemnity is a promise to safeguard or hold harmless the indemnitee against either existing or future liability. *See Dresser Indus.*, 853 S.W.2d at 508; *Lehmann*, 76 S.W.3d at 565. Unlike a release, which discharges a released claim, an indemnity creates a potential cause of action in the indemnitee against the indemnitor. *See Dresser Indus.*, 853 S.W.2d at 508; *Lehmann*, 76 S.W.3d at 565.

Thus, the release language contained in the MSA and the Release provides the released parties with an affirmative defense that bars any claims by the releasing parties on these claims, but this language does not give the released parties a breach-of-contract claim for damages resulting from a releasing party's suit against the released parties on these claims. *See Dresser Indus.*, 853 S.W.2d at 508; *Lehmann*, 76 S.W.3d at 565.[36] The released parties only would have such a claim if the contract in question also contained language in which the releasing parties agreed not to file suit based upon any of the released claims. *See, e.g., Coterill-Jenkins v. Tex. Med. Ass'n Health Care Liab. Claim Trust*, 383 S.W.3d

---

[36] *See also McMahan v. Toto*, 256 F.3d 1120, 1124–25 & n.3 (11th Cir. 2001) (noting prior holding of New York intermediate court of appeals that release language in contract did not constitute a promise by the releasing party not to file suit based upon any of the released claims); *McMahan & Co. v. Bass*, 673 N.Y.S.2d 19, 20–21 (N.Y. App. Div. 1998) (concluding release language in contract did not constitute a promise by the releasing party not to file suit based upon any of the released claims and that such a promise would not exist absent express language in contract establishing such a promise).

581, 590 n.5 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (involving exit letter where both parties agreed to "release" claims and "covenant to not sue the other" on such released claims); *Thompson v. Kerr*, No. 14-08-00978-CV, 2010 WL 2361636, at *2–3 (Tex. App.—Houston [14th Dist.] June 15, 2010, no pet.) (mem. op.) (involving settlement agreement in which releasing parties also promised not to file suit against released parties based upon any released claim). But, as noted, neither the MSA nor the Release contains such language.

The Plank Parties rely upon *Ganske v. WRS Group, Inc*. *See* No. 10-06-00050-CV, 2007 WL 1147357, at *2–4 (Tex. App.—Waco Apr. 18, 2007, no pet.) (mem. op.). Though the *Ganske* court reversed a summary judgment dismissing a claim for breach of a settlement agreement against a releasing party who filed suit on released claims, the court did not analyze or discuss the language of the settlement agreement giving rise to the releasing party's obligation not to file suit on these claims. *See id. Ganske* thus does not support the proposition that release language in a settlement agreement includes a promise not to file suit based upon any of the released claims. *See id.*

The Plank Parties also rely upon *P&S Corp. v. Park*. *See* No. 14-05-00115-CV, 2006 WL 1168804, at *7 (Tex. App.—Houston [14th Dist.] May 4, 2006, no pet.) (mem. op.). In this case, we did not address whether any release language in a settlement agreement includes a promise not to file suit based upon any of the released claims. *See id.* In addition, the settlement agreement in that case did not contain release language, but instead contained an express promise not to sue. *See id.* at *3. *P&S Corp.* is thus not on point.

We conclude that, as to the issue of whether Westergren promised not to file suit based upon any of the released claims, the MSA and Release are unambiguous. Under the plain meaning of these contracts, Westergren released certain claims but

did not promise to refrain from filing suit based upon any of the released claims. *See Dresser Indus.*, 853 S.W.2d at 508; *Lehmann*, 76 S.W.3d at 565. Considering the evidence in the light most favorable to the challenged findings, indulging every reasonable inference that would support them, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, the evidence would enable a reasonable and fair-minded jury to conclude that Westergren did not breach the MSA or the Release. *See City of Keller*, 168 S.W.3d at 823, 827; *Yeh v. David J. MacDougall, D.O., P.A.*, No. 01-06-00509-CV, 2008 WL 183712, at *3–4 (Tex. App.—Houston [1st Dist.] Jan. 17, 2008, no pet.) (mem. op.) (concluding evidence was legally sufficient to support jury's failure to find contract breach). Therefore, the evidence is legally sufficient to support the jury's failure to find that Westergren breached either contract.

In addition, the evidence is factually sufficient. Examining the entire record, considering both the evidence in favor of, and contrary to, the challenged finding, and considering and weighing all the evidence, we conclude the jury's finding that Westergren did not breach the MSA or the Release was not so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See Jackson*, 116 S.W.3d at 761; *Yeh*, 2008 WL 183712, at *5 (concluding evidence was factually sufficient to support jury's failure to find contract breach). Accordingly, we overrule the Plank Parties' first and second cross-issues.

In a conditional cross-issue, the Plank Parties assert that if this court reverses the JNOV and enters judgment for Westergren, any recovery must be limited to $200,000 pursuant to the "Agreement to Limit Third-Party Defendants Indemnity Exposure," entered into by Westergren and various other parties (the "Frontier Parties"). However, the Plank Parties concede that this cap only applies if the Frontier Parties are required to indemnify the Plank Parties for Westergren's

claims in this case pursuant to a settlement agreement and release, entered into between the Plank Parties and the Frontier Parties. In a separate appeal, this court has concluded that, as a matter of law, Westergren's claims do not fall within the scope of the settlement agreement and release. *Frontier Logistics, L.P. v. Nat'l Prop. Holdings, L.P.*, —S.W.3d—, No. 14-11-00357-CV, 2013 WL 1683603, at *6 (Tex. App.—Houston [14th Dist.] Apr. 18, 2013, no pet. h.). Thus, we also overrule the Plank Parties' conditional cross-issue.

## V. CONCLUSION

As to the Plank Parties' motion to disregard jury findings regarding the breach-of-contract claim, Westergren has shown that each independent ground of the motion fails to provide a basis for affirming the trial court's judgment. Thus, we reverse the trial court's judgment with regard to, and reinstate in their entirety, the jury's findings on questions 1, 2, 4, and 5, and partially reinstate the jury's findings on questions 3 and 14 only with regard to Russell Plank. As a result, we also reverse the trial court's judgment disregarding the jury's finding on question 26 as to Westergren's attorney's fees; however, because we conclude that Westergren failed to demonstrate that segregation of his awarded attorney's fees was not required, we remand for a new trial on Westergren's attorney's fees. Because Westergren is the only successful party, we also reverse the trial court's judgment with regard to its allocation of court costs and remand for reallocation. Finally, because Westergren achieved the greatest recovery for his contract claim, we otherwise affirm the trial court's judgment with regard to Westergren's partnership and fraud claims.

Under the plain meaning of the language in the MSA and the Release, Westergren did not promise to refrain from filing suit based on any of the allegedly released claims. Therefore, the record evidence is legally and factually sufficient

to support the jury's findings that Westergren did not breach any contract, and we affirm that portion of the trial court's judgment that the Plank Parties take nothing on their counterclaims. Accordingly, the trial court's judgment is affirmed in part and reversed in part, and we remand for limited proceedings consistent with this opinion.


/s/    Tracy Christopher
           Justice


Panel consists of Justices Frost, Christopher, and McCally. (Frost, J., dissenting).